

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-3-2000

# United States v. Sweeting

Precedential or Non-Precedential:

Docket 99-3774

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"United States v. Sweeting" (2000). *2000 Decisions.* Paper 89.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/89

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 3, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-3774

UNITED STATES OF AMERICA,

      Appellant

v.

DENEEN SWEETING

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Crim. No. 98-00189)
District Judge: Honorable Thomas I. Vanaskie

Argued March 24, 2000

BEFORE: MANSMANN, GREENBERG, and BARRY,
Circuit Judges

(Filed: May 3, 2000)

       David M. Barasch
       United States Attorney
       John C. Gurganus, Jr. (argued)
       Assistant United States Attorney
       United States Attorney's Office
       Middle District of Pennsylvania
       309 Federal Building
       Scranton, PA 18501

       Attorneys for Appellant

          James V. Wade, Esq.
          Federal Public Defender
          Daniel I. Siegel, Esq. (argued)
          Assistant Federal Public Defender
          Federal Public Defender's Office
          100 Chestnut Street, Suite 306
          Harrisburg, PA 17101

           Attorneys for Appellee

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

This matter comes before this court on an appeal by the
government from a judgment of conviction and sentence
entered in the district court on August 26, 1999, against
the defendant Deneen Sweeting ("Sweeting"). This appeal
presents the sole question of whether the district court
abused its discretion in awarding Sweeting a 12-level
downward departure from the sentencing range applicable
under the United States Sentencing Guidelines ("the
Guidelines" or "U.S.S.G.") for extraordinary family ties and
responsibilities pursuant to U.S.S.G. S 5H1.6, p.s.
(hereinafter cited in the text as "section 5H1.6"). After a
careful review of the facts and circumstances of this case,
we are constrained to agree with the government's position
that Sweeting's family ties and responsibilities were not
"extraordinary" in any degree to warrant a departure under
section 5H1.6, and that the district court thus abused its
discretion in departing downward on this basis.
Accordingly, we will vacate the sentence and remand the
case to the district court for sentencing in accordance with
this opinion.

II. FACTS and PROCEEDINGS

On August 11, 1998, a federal grand jury returned a six-
count indictment charging Sweeting with violations of the

Controlled Substances Act. On October 29, 1998, Sweeting pleaded guilty to count V of the indictment, distribution and possession with an intent to distribute cocaine, in violation of 18 U.S.C. S 841(a)(1).

The United States Probation Office prepared Sweeting's Presentence Investigation Report ("PSI"). The PSI calculated that Sweeting was responsible for the distribution of at least 300 grams but less than 400 grams of cocaine. Given Sweeting's offense conduct and prior criminal history, the PSI calculated a total offense level of 19 and a criminal history category of VI, which placed her in the sentencing range of 63-78 months imprisonment under the Guidelines.

Sweeting did not object to the content of the PSI or its calculation of the final offense level and criminal history category. She nevertheless filed a motion seeking a downward departure from the Guidelines range recommended in the PSI, offering the following grounds for the departure request: (1) the Category VI criminal history overstated the seriousness of her prior conduct; (2) she engaged in extraordinary post-offense rehabilitation efforts; and (3) there were extraordinary family ties and responsibilities in this case because she was solely responsible for the care and support of her five children, one of whom had been diagnosed with Tourette's Syndrome. The government opposed the motion, arguing, inter alia, that Sweeting's family responsibilities did not warrant any departure from the Guidelines range recommended in the PSI.

As reflected in the PSI, Sweeting is a single mother of five children who were of ages five through 14 at the time of her sentencing in the district court. In September of 1997, Dr. Kenneth W. Lilik, M.D. ("Dr. Lilik"), a neurologist, diagnosed Sweeting's oldest son as afflicted with Tourette's Syndrome, a neurological disorder characterized by facial and body tics, often accompanied by grunts and compulsive utterances. PSI P 46. Dr. Lilik reported that Sweeting's son suffered from several symptoms of Tourette's Syndrome, including involuntary throat clearing, head nodding, and bringing his fist in contact with his mouth. His report noted that the child displayed head nodding movements during the course of his examination, "particularly as he became

3

more tense." App. at 65. The examination concluded with several treatment suggestions, including daily physical activity, and organization of the young man's personal habits, school work and home responsibilities. Dr. Lilik also provided Sweeting with a list of foods to eliminate from her son's diet, and indicated that her son should avoid taking stimulant decongestive medications and refrain from watching television and video games during the school week. Id.

Dr. Lilik reevaluated Sweeting's son in December 1998. Dr. Lilik noted that he "had transient resolution of his ticks and gulping while he played football," but that his symptoms had returned because he was no longer involved in sports activities. His report concluded by suggesting that Sweeting's son should participate in a daily exercise program (in the mornings) and become involved in sports throughout the entire year. He indicated that "[i]f nonmedication strategies are inadequate, we may consider the use of Pamelor or Zoloft, if he feels that social difficulties remain due to his tics." Dr. Lilik ordered a follow up visit in one year. App. at 64. Sweeting certified that as of May 19, 1999, her son was taking Pamelor to assist in controlling the physical symptoms of Tourette's Syndrome.

The district court held a sentencing hearing on August 25, 1999. During the colloquy between the court and counsel relating to Sweeting's extraordinary family circumstances, defense counsel described the nature of her son's disorder and Sweeting's responsibilities in caring for her son as follows:

> [I]n this particular instance, this is not a handicap that [the child] suffers from which is so disabling that he can't play football, he plays football. Or he can't attend school, he does attend school. But his handicap is permanent, it is neurological, it's medically diagnosed by a pediatric neurosurgeon, and has been introduced into the record. Its practical effect, its manifestation on this young man in school was testified to by Karen DeSantis, who said that it causes him a learning disability. Some of the manifestations are twitching of his eyes, that is, he blinks both of his eyes and it causes him to cock his head back without--in an

4

involuntary manner repeatedly, such that he has had neck sprains while being in school. They flare-up more intensely during times of anxiety and tensions. For instance, in school when he's having tests.

His mother gets up with him at the crack of dawn, does physical exercises with him. This is not--she doesn't have to be an RN or a physical therapist, but this is what she does. She gets him up and goes through physical training with him, which is recommended by [the neurologist]. She closely monitors and regulates the types of foods that he ingests, by and large he has to steer away from sweets and she guards against that. She makes him lunches, she makes him breakfast, she makes him dinner, all the while juggling four other kids and work.

When he comes home at night she has to spend more time with him going through his homework at night. She has a routine with him. And during the more intense times of schooling she does have to regulate and make sure that he takes medication at night to beat back the Tourette's Syndrome. . . .

That is something that is distinct, unique and requires constant attention. It will only get worse if that is not clearly closely monitored, and it is with him for the rest of his life. All of that is documented and supported by the record in this case.

App. at 179-81. Sweeting certified that Dr. Lilik informed her that "without this routine the prognosis is that the symptoms will become more aggravated to the point that he would involuntarily make animal noises, or develop into a serious case of Attention Deficit Disorder." App. at 103.

After hearing testimony and argument from counsel, the court ruled on Sweeting's motion for a downward departure. First, it determined that the PSI overstated Sweeting's criminal history, which it thus reduced from Category VI to Category IV. Second, the court found that Sweeting's extraordinary rehabilitative efforts warranted a 1-level decrease in offense level. This departure reduced the offense level to 18 which, combined with a criminal history Category IV, produced a Guidelines range of 41-51 months

imprisonment. App. at 200. The government does not challenge these downward departures.

The district court, however, made a third departure which forms the basis for the government's appeal in this case. Specifically, the court determined that section 5H1.6 provided a court with the discretion to depart from the Guidelines where the circumstances demonstrated that the defendant's family ties and responsibilities were "extraordinary." From that initial premise, the court found that this case presented extraordinary circumstances because "Ms. Sweeting is a single parent providing for five children, one of whom has a substantial neurological deficit in the form of Tourette's Syndrome." App. at 202. The court then departed downward 12 levels, producing an adjusted offense level of 6, which, combined with a criminal history Category IV, produced a Guidelines range of 6-12 months imprisonment. App. at 203-04. Consistent with that Guidelines range, the district court imposed a sentence of five years probation, 12 months home detention with electronic monitoring, 200 hours of community service, and a special assessment of $100. App. at 13. The district court entered the final judgment of conviction and sentence on August 26, 1999.

The government filed a timely notice of appeal on September 23, 1999. Its sole challenge on appeal relates to the district court's 12-level departure for extraordinary family ties and responsibilities under section 5H1.6.[1]

III. DISCUSSION

In the usual case, the district court is required to impose a sentence within the applicable Guidelines range. See 18 U.S.C. S 3553(b). "For the most part, a court can treat each

_____

1. The district court exercised subject matter jurisdiction pursuant to 18 U.S.C. S 3231, which provides that the district courts have original jurisdiction "of all offenses against the laws of the United States." We exercise appellate jurisdiction over the district court's final order pursuant to 28 U.S.C. S 1291, and have jurisdiction under 18 U.S.C. S 3742(b)(3) to review a final sentence where, as here, the sentence is less than the minimum sentence specified in the applicable Guidelines range.

6

guideline as carving out a `heartland,' a set of typical cases embodying the conduct that each guideline describes." United States v. Baird, 109 F.3d 856, 870 (3d Cir. 1997) (citing and quoting 1994 U.S.S.G. ch. 1, pt. A., intro. comment. 4(b)) (internal quotation marks omitted). But in the unusual case in which a defendant's conduct falls outside the typical "heartland" of cases, the district court may consider whether a departure is appropriate. See United States v. Iannone, 184 F.3d 214, 226 (3d Cir. 1999). Section 5K2.0 of the Guidelines provides that a court may impose a sentence outside the applicable Guidelines range "if the court finds `that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different than that described.' " See U.S.S.G. S 5K2.0, p.s. (quoting 18 U.S.C.S 3553(b)). That section further states that "an offender characteristic or other circumstance that is, in the Commission's view, `not ordinarily relevant' in determining whether a sentence should be outside the applicable guideline range may be relevant to this determination if such characteristic or circumstance is present to an unusual degree and distinguishes the case from the `heartland' of cases covered by the guidelines. . . ." Id.

One of the offender characteristics that the Sentencing Commission specifically has identified as "not ordinarily relevant" in determining an offender's sentence is the defendant's family ties and responsibilities. Section 5H1.6 of the Guidelines provides that "[f]amily ties and responsibilities . . . are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."2 Thus, the Sentencing Commission has classified the existence of family ties and responsibilities as a "discouraged" basis for departure. See Koon v. United States, 518 U.S. 81, 95, 116 S.Ct. 2035,

_____

2. The genesis of section 5H1.6 lies in Congress' directive to the Sentencing Commission to "assure that the guidelines and policy statements . . . reflect the general inappropriateness of considering the . . . family ties and responsibilities . . . of the defendant." 28 U.S.C. S 994(e).

7

2045 (1996) (explaining that the district court's departure analysis must involve a determination whether the Guidelines forbid departures based on the factor, encourage departures on that basis, discourage departures, or do not mention the factor at all). "The Commission does not view discouraged factors `as necessarily inappropriate' bases for departure but says they should be relied upon only`in exceptional cases.' " See id. (quoting 1995 U.S.S.G. ch. 5, pt. H, intro. comment.). Indeed, the commentary to U.S.S.G. S 5K2.0 explains that with respect to a departure decision predicated on a discouraged offender characteristic or other circumstance "not ordinarily relevant" to sentencing determinations, "[i]n the absence of a characteristic or circumstance that distinguishes a case as sufficiently atypical to warrant a sentence different from that called for under the guidelines, a sentence outside the guideline range is not authorized." U.S.S.G.S 5K2.0 comment.

At the risk of stating the obvious, then, a downward departure based on family ties and responsibilities should be the exception rather than the rule. See United States v. Higgins, 967 F.2d 841, 846 (3d Cir. 1992) (remanding to district court to determine, inter alia, if defendant's family ties and responsibilities fell within the "very narrow category" of "extraordinary"); see also United States v. Tocco, 200 F.3d 401, 436 (2d Cir. 2000) ("The district court has broad discretion in dealing with requests for departure . . . but the Sentencing Commission and the courts expect that they will not often occur. . . ."); United States v. Archuleta, 128 F.3d 1446, 1450 (10th Cir. 1997) ("The question before us, then, is whether the record in this case establishes family circumstances so exceptional that they constitute the rare case justifying a departure from the guidelines which already recognize the reality of difficult family circumstances for many defendants and which discourage making an additional allowance on that basis."); United States v. Dyce, 91 F.3d 1462, 1466 (D.C. Cir. 1996) ("[W]e underscore what is implicit in the word `extraordinary' and explicit in the Guidelines themselves: departures on [the basis of family ties and responsibilities] should be rare."). This observation, in turn, must inform our analysis as to the type of family situation which

8

legitimately may be categorized as "extraordinary" and thus outside the typical heartland of cases the Guidelines were designed to cover. See Dyce, 91 F.3d at 1466 (noting that a court may depart on the basis of family ties and responsibilities only if the case "significantly differs from the norm") (internal quotation marks omitted).

We review a district court's decision to depart from the applicable Guidelines range under an abuse of discretion standard, giving due deference to the district court's institutional advantage over an appellate court in comparing one sentencing case to another. See Koon, 518 U.S. at 98, 116 S.Ct. at 2046–47 ("Before a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline. To resolve this question, the district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing."); see also Iannone, 184 F.3d at 227 ("[W]e note the substantial deference that we owe the decision to depart from the Guidelines."). Nevertheless, we agree with the Court of Appeals for the Second Circuit's observation that an appellate court's review of a departure determination in this context must " `ensure that the circumstances relied upon to justify a downward departure are [not] so far removed from those found exceptional in existing case law that the sentencing court may be said to be acting outside permissible limits.' " See United States v. Faria, 161 F.3d 761, 762 (2d Cir. 1998) (quoting United States v. Sprei, 145 F.3d 528, 534–35 (2d Cir. 1998)) (internal quotation marks omitted) (alteration in original); see also Koon, 518 U.S. at 98, 116 S.Ct. at 2047 ("Whether a given factor is present to a degree not adequately considered by the Commission, or whether a discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way, are matters determined in large part by comparison with the facts of other Guidelines cases.").

The issue implicated in this case, simply stated, is whether Sweeting's family circumstances constitute "extraordinary" family ties and responsibilities. As the Court of Appeals for the District of Columbia Circuit

9

recognized in Dyce, "[t]he issue is admittedly a murky one." See 91 F.3d at 1466. Indeed, while

> [i]t may not be unusual, for example, to find that a convicted drug offender is a single mother with family responsibilities, . . . at some point, the nature and magnitude of family responsibilities (many children? with handicaps? no money? no place for children to go?) may transform the `ordinary' case of such circumstances into a case that is not at all ordinary.

See United States v. Rivera, 994 F.2d 942, 948 (1st Cir. 1993); see also Dyce, 91 F.3d at 1466 (quoting Rivera, 994 F.2d at 948).

To reiterate, the district court predicated its ruling on the fact that Sweeting "is a single parent providing for five children, one of whom has a substantial neurological deficit in the form of Tourette's Syndrome." App. at 202. The district court expounded on that point as follows:

> It is a breakdown in the family, a breakdown that is all too common. And we collectively, as a society, should do what we can to support the family and to sometimes take--you can call it a risk or make an investment in a decision that supports the family. And I have decided in this case that I will make that investment collectively on behalf of society that invests in me the discretionary authority to depart downward based upon extraordinary circumstances. I find that the extraordinary circumstance in this case is that Ms. Sweeting is a single parent providing for five children, one of whom has a substantial neurological deficit in the form of Tourette's syndrome. That from all of the evidence that has been presented to me, Ms. Sweeting is a substantial positive influence on the children's lives. That incarceration would have a very serious detrimental effect on the family unit, that it would break up the family unit, and that's a consequence that I don't want to see happen in this case.
>
> It's a consequence that I think we as a society should, when we have the ability, try to avoid. It's not a decision I make that is lightly taken, and it is also a decision I know that's in some respects risky, maybe

10

you call it a high risk investment in light of Ms.
Sweeting's prior record.

App. at 202-03.

The government contests the district court's ruling on
several grounds. First, it maintains that the court erred in
relying upon the fact that Sweeting is the sole provider for
her five children because we determined in United States v.
Headley, 923 F.2d 1079 (3d Cir. 1991), that a defendant's
status as a single mother of five children was not
"extraordinary" in the sense that it was so atypical of the
situations facing most convicted felons that it fell outside
the heartland of cases sentenced under the Guidelines.
Next, it points out that under our case law, the fact that
Sweeting is a substantial positive influence on her
children's lives and that her incarceration would break up
the family unit similarly does not take this case out of the
heartland and render her situation extraordinary. Itfinally
contends that the fact that Sweeting's oldest child suffers
from Tourette's Syndrome is insufficient under the
circumstances of this case to support the district court's
ultimate factual finding that her family responsibilities were
extraordinary. It points out in this connection that there is
nothing extraordinarily atypical about Sweeting's
responsibilities to her oldest son, or the needs of the child
himself, that indicate that her presence at home is essential
to his care and well-being.

We agree entirely with the government's assessment of
the circumstances of this case. Put simply, we find that
none of the factors the district court considered, taken
individually or in their entirety, present extraordinary
family ties and responsibilities taking this case out of the
heartland of cases sentenced under the Guidelines. 3
_____

3. We point out that the government does not challenge the accuracy of
the evidence in the record concerning the nature of Sweeting's family ties
and responsibilities--for example--the type of specialized care her son
requires because of his condition. Rather, it asserts that the facts in
the
record do not warrant a downward departure because they do not
demonstrate that her family situation is extraordinary in the sense
contemplated by section 5H1.6. Similarly, for purposes of our analysis,
we assume the accuracy of the historical facts in the record, but part

11

Consequently, we find that Sweeting's family ties and responsibilities present an insufficient basis for a departure pursuant to section 5H1.6.

First, as our cases repeatedly have recognized, the circumstance that Sweeting's incarceration will disrupt the family unit cannot be considered atypical, inasmuch as innumerable defendants no doubt could establish that their absence will cause a void in their children's lives. As a practical matter, it may be said that most children look to their parents for support, guidance and stability. But, as we indicated in United States v. Gaskill, 991 F.2d 82 (3d Cir. 1993), "[d]isruptions of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration. Disintegration of family life in most cases is not enough to warrant departures." Id. at 85 (citation and internal quotation marks omitted); see also United States v. Reilly, 33 F.3d 1396, 1424 n.22 (3d Cir. 1994) (quoting Gaskill, 991 F.2d at 84); accord Dyce, 91 F.3d at 1468 (as "innumerable defendants could no doubt establish[,] . . . a prison sentence[ ] normally disrupts . . . parental relationships") (internal quotation marks omitted); United States v. Brown, 29 F.3d 953, 961 (5th Cir. 1994) (same).

We also point out that while Sweeting appears devoted to her children and is "a substantial positive influence" on their lives, see app. at 203, the district court's reliance on those facts was inappropriate because they do not take this case out of the "heartland" of cases sentenced under the

_____

company with the district court's ultimate factual conclusion that those circumstances render Sweeting's family ties and responsibilities so "extraordinary" so as to take this case out of the heartland of cases sentenced under the Guidelines.

Moreover, it is appropriate to mention at this juncture that although our analysis of the nature of Sweeting's family responsibilities proceeds by examining each component of the district court's analysis separately, we have considered the cumulative effect of the totality of the circumstances presented in this case. And, as we have indicated in the text, we simply see no sound basis for upholding the district court's departure determination notwithstanding our deferential standard of review.

12

Guidelines involving a defendant who also is a parent. Indeed, in United States v. Shoupe, 929 F.2d 116 (3d Cir. 1991), we expressly rejected the defendant's argument that a departure under section 5H1.6 was warranted because he was a good father to his son. There the defendant's presentence report revealed that he had a young son who resided with his former wife, that the defendant paid regular child support, frequently spoke with the child by telephone and visited him. Defendant's counsel stated at the sentencing hearing that his client was "a good father." See id. at 121. We held that "[t]hese facts do not show such extraordinary family ties and responsibilities as to justify a departure despite Section 5H1.6." Id.; see also United States v. Wilson, 114 F.3d 429, 434 (4th Cir. 1997) (reversing downward departure based on district court's finding that defendant's attention to his children was extraordinary based on the defendant's lack of parental guidance as a child); United States v. Webb, 49 F.3d 636, 638 (10th Cir. 1995) (reversing district court's downward departure where circumstances showed only that defendant was sole caretaker of his son, had positive influence on his life, and that son needed "to be taken care of "); United States v. Brand, 907 F.2d 31, 33 (4th Cir. 1990) (finding that district court erred in awarding downward departure for extraordinary circumstances; court of appeals found that the factors the district court relied on, specifically the fact that the defendant's children would be separated and placed with "blood strangers," simply were not extraordinary).

The district court also relied in its departure ruling on the related circumstance that Sweeting was a single mother and the sole provider for her five children. But in doing so, the government is correct that the court appears to have overlooked our opinion in United States v. Headley, 923 F.2d 1079. Headley was a single mother of five children, ranging in age from 11 months to 11 years who was convicted of charges stemming from her activities as a drug courier for a large narcotics manufacturing and distribution organization. She had a relationship with the leader of the drug organization in which she participated, and it was undisputed that he was the father of her five children. Headley argued in the district court for a downward

departure for extraordinary family responsibilities under section 5H1.6, but the court held that it lacked authority to depart downward from the applicable Guidelines range on that basis. The district court thus sentenced Headley to 17 years imprisonment, the minimum in her Guidelines range. See id. at 1081–82.

Headley appealed, arguing that the district court erred in concluding that it lacked authority to consider the psychological impact that a lengthy sentence would have on her five young children. We rejected her argument, explaining that as of that time, "every court to consider the issue of departure based on the effect that sentencing a single parent to prison will have on minor children has found the circumstances not to be extraordinary." See id. at 1082. But see United States v. Johnson, 964 F.2d 124, 129 (2d Cir. 1992) (deciding after Headley that section 5H1.6 departure was warranted because the defendant, who"was solely responsible for the upbringing of her three young children, including an infant, and of the young child of her institutionalized [adult] daughter, . . . faced extraordinary parental responsibilities").

We obviously predicated our ruling in Headley  on the unfortunate reality that single parents often commit crimes requiring incarceration. As the Court of Appeals for the Fourth Circuit explained in United States v. Brand:

> A sole, custodial parent is not a rarity in today's society, and imprisoning such a parent will by definition separate the parent from the children. It is apparent that in many cases, the other parent may be unwilling or unable to care for the children, and that the children will have to live with friends, relatives or even in foster homes. . . . [Defendant's] situation, though unfortunate, is simply not out of the ordinary.

907 F.2d at 33; see also United States v. Leandre, 132 F.3d 796, 807–08 (D.C. Cir. 1998) (affirming district court's denial of the defendant's request for downward departure under section 5H1.6 based on fact that he was a single father of two young children who might be placed in foster care as a result of incarceration; court of appeals stated that "[f]rom the perspective of the defendant's children, the

14

result may be harsh but it is not so extraordinary a circumstance confronting sentencing judges"). Thus, despite the fact that Headley's situation was unfortunate, we held that incarceration of a single parent and its concomitant effects on the children simply cannot be characterized as out of the ordinary. Accord Archuleta, 128 F.3d at 1450; Leandre, 132 F.3d at 807–08; United States v. Rodriguez–Valarde, 127 F.3d 966, 969 (10th Cir. 1997) (collecting cases); Webb, 49 F.3d at 638–39; United States v. Chestna, 962 F.2d 103, 107 (1st Cir. 1992); Brand, 907 F.2d at 33. We therefore agree with the government's position that the district court's ruling, to the extent that the court predicated it on Sweeting's status as a single mother, was inconsistent with our decision in Headley.

As the foregoing demonstrates, the fact that Sweeting is a devoted single mother of five whose children solely depend on her for support and guidance simply does not meet the threshold of "extraordinary" when compared to the innumerable cases in which parents commit crimes and are sentenced under the Guidelines. Thus, we must consider at this point the only factor that arguably removes this case from the heartland of cases under the Guidelines, and distinguishes this case from the situation we faced in Headley––namely, that Sweeting's oldest son suffers from Tourette's Syndrome.4 Sweeting argues that it is clear that responsibility for the care of a sick family member may constitute an extraordinary circumstance warranting a departure. See br. at 18. She contends that the record demonstrates that her "extraordinary efforts are essential to her son's continued health and well–being." Br. at 14.

We are unpersuaded. First, we point out that a review of the district court's comments at the sentencing hearing

_____

4. Sweeting apparently recognizes that her son's condition is pivotal to the analysis of whether the district court erred in granting a departure under section 5H1.6 given her family situation. Importantly, this factor is the sole basis on which she argues in her brief that she faces "extraordinary" family responsibilities. See br. at 12 ("It is submitted that
this mother's responsibilities for the care of an adolescent child with Tourette's Syndrome constituted an extraordinary family responsibility. For this reason, the district court did not abuse its discretion [in] granting the downward departure.").

15

confirms that in granting the downward departure under section 5H1.6, the court was motivated primarily by the circumstance that Sweeting's incarceration would break up the family unit because of her status as a single parent. See app. at 201-02 ("[T]he circumstances of this case are extraordinary. We are dealing with a single parent."); id. at 202 ("It is a breakdown in the family, a breakdown that is all too common. And we collectively, as a society, should do what we can to support the family. . . ."); id. at 203 ("[I]ncarceration would have a very serious detrimental effect on the family unit[;] it would break up the family unit, and that's a consequence that I don't want to see happen in this case."). Indeed, the district court only mentioned her son's Tourette's Syndrome once in the entire course of its findings on this point: "I find that the extraordinary circumstances in this case is that Ms. Sweeting is a single parent providing for five children, one of whom has a substantial neurological deficit in the form of Tourette's Syndrome." App. at 202. It did not make any specific factual findings regarding the severity of Sweeting's son's condition, or the nature of care that she provides to him. Thus, while on appeal Sweeting presses this particular family circumstance as the definitive factor justifying the district court's departure determination, the district court did not predicate its ruling to any significant degree on the fact that her son had Tourette's Syndrome.

Second, and more importantly, while we in no way intend to minimize the difficulties facing a parent whose child suffers from Tourette's Syndrome, the record in this case suggests that there is nothing about the severity of this child's condition or the nature of the care that he requires indicating that Sweeting is so irreplaceable that her otherwise ordinary family ties and responsibilities are transformed into the "extraordinary" situation warranting a departure under section 5H1.6. First, as to the nature of the care that her son requires, the evidence demonstrates that after Sweeting's son was diagnosed with Tourette's Syndrome, his neurologist, Dr. Lilik, provided several treatment suggestions, including daily physical activity, and organization of the young man's personal habits, school work and home responsibilities. Dr. Lilik also provided Sweeting with a list of foods to eliminate from her son's

16

diet, and instructed that her son should avoid taking stimulant decongestive medications and refrain from watching television and video games during the school week. On a follow up visit, Dr. Lilik suggested that Sweeting's son should participate in a daily exercise program (in the mornings) and become involved in sports throughout the entire year.

The record indicates (and the government does not dispute) that Sweeting complied with Dr. Lilik's suggestions. See app. at 180-81 (describing Sweeting's care for her son as consisting of exercising with him in the mornings, shopping for and preparing his meals, helping him with his homework, and administering his medication when necessary). And we agree with Sweeting that the record reflects the fact that her son must continue this diet and exercise regimen to combat and control the symptoms of his condition. Nevertheless, there simply is nothing about the type of care that he requires that suggests to us that it is so unique or burdensome that another responsible adult could not provide the necessary supervision and assistance in Sweeting's absence. As the government pointed out at oral argument, the degree of extra attention that her son needs as a result of his condition pales in comparison to that which is required by an infant who needs constant care and supervision. Compare Dyce, 91 F.3d at 1467 (rejecting defendant's argument that downward departure was necessary so that she could care for and nourish her three-month old infant); Headley, 923 F.2d at 1082 (youngest child was 11 months old).

Moreover, as the record demonstrates, the regimen that Sweeting has followed with her son thus far has assisted him in controlling the effects of his condition. Sweeting's attorney recognized that his condition is not "so disabling that he can't play football, he plays football.[It is not so disabling that] he can't attend school, he does attend school." App. at 179-80. Thus, it does not appear that the child's Tourette's Syndrome is so severe that it precludes him from participating meaningfully in various school and social activities.

These observations confirm that while her child's neurological condition supports Sweeting's contention that

17

he "needs to be taken care of " in a way that differs from the needs of her other four children, her responsibilities to her son do not differentiate her situation to such a degree so as to support the finding that her case is extraordinary. Our conclusion on this point is guided, as it must be, see Koon, 518 U.S. at 98, 116 S.Ct. at 2047, by other cases in which a defendant has sought a downward departure under section 5H1.6 under similar factual circumstances--namely where the defendant claimed "extraordinary" family responsibilities in part due to his or her obligation to care for a disabled family member. While we have found several cases that support our conclusion in this case, we need only highlight the most pertinent to our analysis on this point.

For example, in Archuleta the Court of Appeals for the Tenth Circuit reversed the district court's downward departure under section 5H1.6 based on the circumstance that the defendant was the sole support for two of his children and cared for his elderly, diabetic mother. See 128 F.3d at 1447. There the defendant pleaded guilty to providing false statements in the acquisition of afirearm in violation of 18 U.S.C. S 922(a)(6), and to one count of being a felon in possession of a firearm in violation of 18 U.S.C. S 922(g)(1). The district court departed downward 8 levels from the applicable Guidelines range and imposed a sentence of five months imprisonment, five months home confinement, and three years supervised release based on his extraordinary family ties and responsibilities. See id. at 1447-48.

The court of appeals vacated the sentence, finding that the family circumstances the district court relied upon to justify its departure were insufficient to take this case out of the "heartland" of cases governed by the Guidelines. See id. at 1452. The court first found that the district court's reliance on the defendant's status as sole caretaker of his children as a basis for the section 5H1.6 departure was inconsistent with the court's decision in United States v. Webb, 49 F.3d 636, which held that the defendant's status as a single parent of a son did not constitute an extraordinary circumstance warranting a departure. See id. at 1450. With respect to the district court's reliance on

18

defendant's status as the caretaker of his diabetic, elderly mother, the court of appeals observed that

> the record is scarce on the details of the care she requires. Nor does the record say anything about the mother's mental and physical abilities, including her ability to prepare her own meals and, perhaps, partially care for the children. Assuming the mother cannot administer her own medication or maintain a properly balanced diet, the record is equally silent on the availability of home nurse visits and other services for the sick and elderly.

> The record reflects the representation of Archuleta's counsel that six of his eight siblings in the Espanola area cannot undertake his mother's care, or that of Archuleta's children. There is no evidence regarding the remaining two siblings, or the availability of other alternatives for care.

Id. at 1450-51.

Similarly in United States v. Allen, 87 F.3d 1224 (11th Cir. 1996), the defendant pleaded guilty to one count of bank fraud in violation of 18 U.S.C. S 1344 after she admitted to diverting approximately $138,000 of her employer's funds into her own bank account. The relevant Guidelines range called for a sentence of 12-18 months for the crime. At sentencing, the defendant sought a departure for extraordinary family ties and responsibilities based on the fact that she was the primary caretaker of her 70-year old father who suffered from Alzheimer's and Parkinson's diseases. The district court departed 5 offense levels and sentenced the defendant to one hour of imprisonment, and 36 months of supervised release. See id. at 1225.

The Court of Appeals for the Eleventh Circuit vacated the sentence and remanded the matter to the district court for resentencing. Citing several cases in which the courts denied departures because the circumstances were not atypical, the court stated that in its view, the defendant's family responsibilities "though difficult, are not extraordinary." See id. The court noted specifically that the defendant was not "the only family member available to care for her father. The Presentence Report indicates that

19

[the defendant's] husband and adult son take care of her father to some extent, and that [the defendant] has a brother and another adult child living nearby." Id. at 1226 n.1.

Finally, in United States v. Rybicki, 96 F.3d 754 (4th Cir. 1996), the defendant was convicted for conspiracy and perjury. See id. at 756. The district court granted the defendant a 5-level downward departure, in part on the basis of his extraordinary family responsibilities. The Court of Appeals for the Fourth Circuit initially reversed the district court's 5-level departure. See United States v. Rybicki, 1995 WL 420001 (4th Cir. July 13, 1995). But in light of its decision in Koon, the Supreme Court vacated the court of appeals' judgment and remanded the case for further consideration. See Rybicki v. United States, 518 U.S. 1014, 116 S.Ct. 2543 (1996).

On remand, the court of appeals adhered to its earlier ruling reversing the district court's departure, but modified its reasoning after considering Koon. The court recognized that the district court based its downward departure in part on the fact that the defendant had a nine-year old son with neurological problems who was in need of special supervision, and a wife experiencing a period of fragile mental health. It nevertheless held that the record indicated that defendant's responsibilities to his son and wife were not factors present to an "exceptional degree" so as to warrant a departure under section 5H1.6. See id. at 759.

Here, in a situation consistent with those in Archuleta, Allen, and Rybicki, Sweeting's son's Tourette's Syndrome obviously requires that he receive additional attention and care. Nevertheless, there is nothing extraordinary about the nature or severity of his condition, his physician's prescribed method of treatment, or the type of assistance Sweeting provides, which compels the conclusion that no other competent adult could make sure that her son continues to exercise, eat and sleep properly, and take his medication at the appropriate times. Sweeting maintains throughout her brief that this regimen is an essential part of her son's treatment, but again there is nothing in the record suggesting that Sweeting (and only Sweeting) can

20

provide him with the care and attention he needs, or that he as a teenager cannot take some responsibility for his own care. This, we believe, is an important factor to consider in determining whether the district court's section 5H1.6 departure was warranted. See Tocco, 200 F.3d at 435-36 (remanding for resentencing where district court departed 2 levels for extraordinary family responsibilities where the defendant's wife had cancer and emphysema; court of appeals instructed that on remand, the district court should "make specific findings regarding [the defendant's] personal involvement in the care of his wife and other family members," and should consider whether his wife had "alternative sources of support," inasmuch as the record demonstrated that the defendant had eight children, seven of whom lived in the area and one of whom was a doctor); see also Dyce, 91 F.3d at 1467 (finding that district court's downward departure under section 5H1.6 on the basis that the defendant was breast feeding her child at the time of sentencing was erroneous; court reasoned in part that "there is no evidence in the record supporting the district court's statement in its Sentencing Opinion that the infant was `totally dependent on [Dyce] for nourishment,' nor is there any evidence that the child could not have been fed from a bottle."); United States v. Shortt , 919 F.2d 1325, 1328 (8th Cir. 1990) (vacating district court's departure based on defendant's position as the sole provider for his family and the fact that he assisted his disabled father on his farm; court of appeals determined that defendant's two brothers could help their father on the farm, and defendant's position as the provider for his family did not make his case "extraordinary").

We also note that these decisions further demonstrate the point that a family member's medical problems cannot be viewed in a vacuum; rather, courts considering whether to depart must weigh carefully, among other things, the severity of the condition and the degree of extra attention that it requires. See Gaskill, 991 F.2d at 82-84. Thus, while we recognize that there is evidence in the record that supports the conclusion that Sweeting's son has experienced behavioral and learning difficulties associated with his condition, we find it relevant to our ultimate determination that her son is able to attend school and

21

participate in various sports activities with a large measure of success. These facts, which are uncontroverted by the parties, certainly undercut Sweeting's argument that her son's disorder presents her with extraordinary family responsibilities--at least to the extent that her argument rests in part on the fact that her son is a "chronically infirm child," see br. at 11, 18, who suffers from "a rare medical condition." App. at 35. As the record reflects, Sweeting's son attends high school, has been the captain of the football team, and has participated in track andfield, basketball, baseball and karate. App. at 34, 106-07.

Finally, Sweeting's counsel represented at the sentencing hearing that Sweeting made arrangements with friends "who she could trust" to take care of her children, including her son, in the event that the district court rejected her downward departure request and sentenced her to a period of incarceration. App. at 178. In particular, Sweeting informed the district court that she had arranged for someone in Edgewood, Maryland, to care for her son. Id. This fact further confirms that in Sweeting's absence, her son would not be left without anyone to care for him and assist him in managing his symptoms, which in turn undercuts her apparent concern (and presumably that of the district court) that her son's condition would go unregulated in her absence. See Dyce, 91 F.3d at 1467 (noting, as a factor militating against departure, that the children would be cared for by defendant's family rather than placed in foster care); United States v. Abbott, 975 F. Supp. 703, 709 (E.D. Pa. 1997) (rejecting defendant's downward departure motion under 5H1.6 where his mother and wife could care for his children, despite the fact that wife and mother had medical problems); cf. Leandre, 132 F.3d at 807-08 (affirming district court's denial of departure under section 5H1.6 where defendant was a single father of two young children who might be placed in foster care if defendant's brother refused to care for them; "[s]uch evidence of a difficult family situation that will arise upon [defendant's] incarceration is, unfortunately, no more extraordinary than that deemed by the Dyce court not to be sufficiently extraordinary for a departure").

It thus appears from a review of the record that the fact

that Sweeting's son is afflicted with Tourette's Syndrome does not render this case distinguishable from Headley to a degree sufficient to warrant a departure under section 5H1.6. Indeed, when compared to the facts in Archuleta, Allen, Rybicki and other courts of appeals' decisions on point, it is clear to us that the existence of his condition does not present a situation in which incarceration would cause Sweeting or her son to suffer an atypical hardship sufficient to take this case out of the heartland of cases in which a parent has committed a crime requiring incarceration.5 At bottom, the unfortunate fact is that her

_____

5. We recognize, as Sweeting points out in her brief, that there are decisions by other courts of appeals that have upheld downward departures under section 5H1.6 where the circumstances demonstrated that the defendant was responsible for the care of a sick family member. She contends that those cases support her position because the defendants were responsible for the care of dependents, at least one of whom was disabled. We reject this argument, however, as we do not agree with Sweeting's assessment that the cases she cites are analogous to the factual situation presented here. Indeed, a review of the cases that she relies upon confirms that each had an additional factual component distinguishing it from this case. See, e.g., United States v. Haversat, 22 F.3d 790, 797 (8th Cir. 1994) (upholding district court's finding that section 5H1.6 departure was warranted based on totality of circumstances which indicated that defendant's wife had suffered "severe psychological problems which [had] been potentially life threatening," defendant was involved actively in her care and wife's treating physician characterized his participation as an "irreplaceable part" of his wife's treatment plan, doctor's testimony confirmed that he (the doctor) depended on the defendant to identify the beginning of his wife's regression, and doctor stated on the record that he would have "grave clinical concerns that her medical management could be safely continued without the ongoing presence of her spouse"; court of appeals, however, remanded for resentencing because the extent of the departure was unreasonable); United States v. Sclamo, 997 F.2d 970, 972 (1st Cir. 1993) (upholding district court's departure under section 5H1.6 where the defendant had developed a special and crucially important relationship with girlfriend's 12-year old son, who suffered from Attention Deficit Disorder and had been physically abused by his biological father; child underwent weekly individual psychotherapy and his psychologist submitted letters to the court concluding that the defendant "played a major positive role in [the child's] therapy" and that his continued presence was "necessary for [the child's] increasing

23

children will suffer the same type and degree of injury felt by any family where a parent is incarcerated. Cf. United States v. Maddox, 48 F.3d 791, 799 (4th Cir. 1995) (remanding for resentencing for further development of the record on the nature of defendant's family responsibilities, but opining that evidence that defendant "relates well" to his severely mentally retarded sister, provides "invaluable care for her and his mother," and is "crucial to the structure and stability of his family" was insufficient to show that defendant's family ties were extraordinary); United States v. Goff, 20 F.3d 918, 921 (8th Cir. 1994) (pre-Koon decision applying de novo standard of review and determining that district court erred in awarding section 5H1.6 departure where defendant supported three young sons and his wife had begun receiving Social Security disability benefits for a depression disorder and anxiety attacks; court stated that defendant's family responsibilities were "not outside the heartland of cases that the Sentencing Commission has considered").

Sweeting contends nevertheless that her son's school principal, Karen DeSantis, testified at the sentencing hearing that Sweeting's continued parental efforts are essential to her son's continued health and well-being because his life is "on a tightrope." She argues that the record confirms that she is an essential part of her son's life because it is her extraordinary efforts that are keeping him from falling "off that tightrope." Br. at 14.

To be sure, Ms. DeSantis stressed that Sweeting's son needed a great deal of guidance and one-on-one contact, and opined that his life "is on a tightrope." App. at 217, 220. But as the government correctly states, her testimony on this point must be read in context. The fact that Sweeting's son needs one-on-one guidance does not lead to the conclusion that Sweeting is the only person capable of

---

progress"; and that the defendant "continues to be the only available resource for positive bonding"); United States v. Alba, 933 F.2d 1117, 1122 (2d Cir. 1991) (upholding departure where record showed that the defendant had a wife and two daughters, aged four and 11, lived with his grandmother and disabled father who depended on the defendant to assist him moving in and out of a wheelchair).

24

providing it. Compare United States v. Haversat , 22 F.3d 790, 797 (8th Cir. 1994); United States v. Sclamo, 997 F.2d 970, 972 (1st Cir. 1993). Moreover, to the extent that her testimony supports the conclusion that Sweeting is a positive influence on her son's life, as we have indicated above, that circumstance is not the atypical or extraordinary situation warranting a departure.

More importantly, it is clear to us from a reading of her entire testimony on this point that her reference to Sweeting's son's life being on a "tightrope" is based not primarily on the fact that his Tourette's Syndrome has affected his learning abilities and behavior, but on the circumstance that he is a "Black male in Scranton" that may succumb to peer pressure more readily.[6] App. at 220. Again, while certainly unfortunate, there is nothing extraordinary about the effect of peer pressure on high school children that takes this case out of the"heartland" of cases sentenced under the Guidelines where the defendants have family responsibilities to their adolescent children. Indeed, we do not quarrel with the proposition

_____

6. The following exchange between Sweeting's counsel and Ms. DeSantis provides further context for the principal's statement that we quote in the text:

> Q. Can you describe some of the peer pressures tha t may exist for a young Black male in the City of Scranton in 1999?
>
> A. Well, I think more--and you mentioned the you ng Black male, and I think that half of it has to be considered. Too many of the Black students will say to me, you know, Ms. DeSantis, I have so much pressure against me to achieve. So many of my friends will call me names if I try and achieve. And I can see[defendant's son] in a more open environment, a larger school if he goes to Scranton High School, more students, more freedom, I can see him bending to that pressure. He needs strong parental guidance, more than [her second child].
>
> I could see a tremendous problem with him if he doesn't have a firm hand on him. He needs someone that's going to be in the school the first type of slight problem, that's going to work with the school and work with him. He is going to need that right from the beginning.

App. at 218-19.

that a parent is an important influence on a child's growth and maturation into adulthood. But the fact that Sweeting provided such guidance to her son does not differentiate the situation here from other cases in which children whose parents are incarcerated similarly lose that support system.[7]

Sweeting also maintains that her family situation is similar to that involved in United States v. Gaskill, where we held that the defendant's responsibility of providing the only source of care to his mentally ill wife presented an "extraordinary" family responsibility that took his case out of the heartland of cases governed by the Guidelines. See 991 F.2d 82. Sweeting's protestations notwithstanding, our review of the factual circumstances presented in Gaskill confirms that the result in that case actually supports our finding that the departure awarded here was a clear abuse of discretion.

In Gaskill, a former president of a computer company pleaded guilty to fraudulent use of social security numbers to obtain things of value. See 991 F.2d at 83. At sentencing, he sought a downward departure based on his extraordinary family ties and responsibilities to his wife. The record demonstrated that Gaskill resigned from his well-paid position at a computer company, at least partially because of his wife's erratic conduct caused by an onset of mental illness. Gaskill's wife, a college graduate who in her earlier years had careers as an interior decorator, teacher, and businesswoman, suffered her first serious mental illness following the birth of their fourth child. Over the years, she experienced bouts of depression accompanied by suicide attempts and was hospitalized in a number of institutions, having displayed erratic and compulsive behavior brought on by her manic depressive condition. See id.

_____

7. At oral argument, Sweeting's attorney pointed to the fact that Sweeting's son had been teased by his peers because of the effects of his condition on his behavior. He argued that the other children's inappropriate actions supported his argument that Sweeting's son needs his mother's influence in his life. But we cannot ascribe significance to the fact that her son is being ridiculed by his adolescent peers, as unfortunately that circumstance is not atypical.

26

At sentencing, Gaskill introduced letters and testimony concerning the nature and severity of his wife's condition, and his role in caring for her. He submitted a letter from his wife's attending psychiatrist which indicated that she had experienced intellectual deterioration evidenced by a marked decrease in vocabulary and reduced verbal communication. The record also demonstrated that his wife watched television for 15 or 20 minutes a day, and stayed in bed resting for the remainder of the day. Moreover, Gaskill's wife had no personal friends and had no contact with extended family members. Gaskill testified at the sentencing hearing about the deleterious effect that his wife's illness had on her relationship with her children, explaining that they thought their mother was vindictive and cruel, and did not understand that her behavior was related to her mental illness. See id. at 83-84.

In addition to the testimony concerning the severe nature of his wife's mental illness, the evidence overwhelmingly demonstrated Gaskill's indispensable role in maintaining his wife's well being. Indeed, the record showed that Gaskill performed almost all household chores and was responsible for administering proper medication for his wife. Moreover, her psychiatrist opined that Gaskill's wife was totally dependent on him, and that her medication was an essential aspect of her treatment. See id. at 84.

The district court denied Gaskill's departure request, stating that it lacked authority to depart under section 5H1.6. Consistent with the applicable Guidelines range, the district court imposed a four-month period of incarceration, followed by four months in a halfway house or a community treatment center, and a period of supervised release. See id. at 83. On appeal, we vacated Gaskill's sentence and remanded the matter to the district court for resentencing. We explained that section 5H1.6 does not prohibit departures, but restricts them to cases where the circumstances are extraordinary. We found that the situation presented by Gaskill's family responsibilities to his wife stood in "sharp contrast" to the cases in which departure was found to be unwarranted. See id. at 85-86. First, there was no real dispute that his wife's mental condition was serious. Moreover, we pointed out that the

wife's current living status demonstrated the defendant's pivotal role in her care. At oral argument, Gaskill's attorney represented that since his incarceration, his wife had been living alone, subsisting on food that her daughter left once a week, did not leave the house, and had not seen her doctor. See id. at 84 n.1.

In addition to the fact that the record demonstrated that Gaskill's wife suffered from serious effects of her mental illness and depended totally on her husband for care, we also explained that "the length of imprisonment mandated by the Guidelines and the nature of the offense are also circumstances that should be factored into the equation" in determining whether a departure is warranted. See id. at 85. In particular, we contrasted the circumstances in Gaskill to the facts in Headley where the lower end of Guidelines range for the defendant's drug conviction required a sentence of 17 years imprisonment, and noted that given the substantial sentence required, the children were destined to be consigned to foster care even if the sentence were reduced substantially. We further distinguished Headley because that case presented "some question whether the best interests of the children would be served by allowing them to remain under the care of the defendant who had exposed them to the atmosphere of large scale drug dealings." Id. We summarized our holding in Gaskill as follows:

> [t]he record demonstrates circumstances quite out of the ordinary. The degree of care required for the defendant's wife, the lack of close supervision by any family member other than the defendant, the risk to the wife's well being, the relatively brief--in one sense --imprisonment sentence called for by the Guidelines computation, the lack of any end to be served by imprisonment other than punishment, the lack of any threat to the community--indeed, the benefit to it by allowing the defendant to care for his ailing wife--are all factors that warrant departure.

Id. at 86.

We find the circumstances in this case clearly distinguishable from the situation we faced in Gaskill for a

28

number of reasons. First, as previously mentioned, there was no indication in Gaskill that the defendant had a violent nature, nor was his offense classified as a violent crime. Here, as in Headley, Sweeting was convicted of a violation of the Controlled Substances Act, which Congress considers a serious crime that endangers the community as a whole. Moreover, unlike the defendant in Gaskill, where we found that there was "no indication that the defendant has a violent nature," id. at 85, the PSI confirms that Sweeting engaged in violent behavior in the past in connection with some of her prior crimes. Furthermore, it is clear that unlike the defendant in Gaskill , Sweeting had been engaged in a criminal business, i.e., the sale of narcotics. Thus, we believe that this case presents a situation in which "there would be some question whether the best interests of the children would be served by allowing them to remain under the care of the defendant," see id., who admitted to engaging in drug sales to enable her to purchase items of value for herself and her children. See Abbott, 975 F. Supp. at 710 (distinguishing Gaskill because defendant had "a history of crimes involving actual violence, the threat of violence, and the use of weapons").8

Second, the severity of Gaskill's wife's mental illness, the degree of care required in response to it, and the lack of available alternative sources of care further distinguish this case from Gaskill. It is fair to say that the record in Gaskill demonstrated to us that Gaskill's wife had limited (if any) ability to function normally, and that her husband was essential to sustaining her well being because the effects of her illness alienated her remaining family and friends. The degree of care that Sweeting's son requires as a result of his disorder pales in comparison; the record shows that Sweeting exercises with him in the morning, monitors his diet by restricting the type of foods he eats, makes sure that he takes his medication and gets sufficient sleep, and sees the doctor once a year. But as we previously found, there is nothing in the record indicating that another

_____

8. The PSI further stated that after Sweeting's arrest, government agents executed a search warrant at her residence in Scranton, finding, inter alia, a Ruger .45 caliber semi-automatic pistol and two loaded magazines. PSI P 13.

responsible adult could not (and would not) perform these obligations in Sweeting's absence. Sweeting made arrangements for her son to live with a friend in Maryland that she trusted, and it would be mere speculation on our part if we were to find that the person she chose would be unable or unwilling to monitor her son's care as necessary. Moreover, unlike the situation presented in Gaskill, it cannot be said that her son's condition requires constant, around-the-clock attention, and there is no statement from Dr. Lilik indicating that his continued health depends totally on her presence in the home. Compare Gaskill, 991 F.2d at 84.

Finally, we point out that Sweeting's sentence under the Guidelines is significant, even after we account for the other departures the district court granted and which the government does not challenge on this appeal. Sweeting was subject to a sentence in the Guidelines range of 41-51 months, which is a substantially longer period of time than the eight-month sentence mandated by the applicable Guidelines range in Gaskill. In Gaskill , the relatively light Guidelines sentence was a factor that militated in favor of granting a departure under section 5H1.6, inasmuch as only a slight departure would yield the necessary result of keeping the family intact. See id. at 85-86. Here, however, the district court granted Sweeting a 12-level departure in order to achieve the same result, which, as we have indicated, she did not deserve in the first place.

Finally, in view of the record presented, we see no merit in the argument that a finding of an abuse of discretion in this case ignores the district court's "special competence" in assessing the "ordinariness or unusualness" of a particular case. See Koon, 518 U.S. at 99, 116 S.Ct. at 2047. To the contrary, we recognize the indispensable role of the district court in making the fact-intensive determination that is critical to the analysis required by section 5H1.6 and our case law applying that provision. We nevertheless agree with the Court of Appeals for the Second Circuit's observation that appellate courts "must ensure that the circumstances relied upon to justify the downward departure are [not] so far removed from those found exceptional in existing case law that the sentencing court

30

may be said to be acting outside permissible limits." See Faria, 161 F.3d at 762 (internal quotation marks omitted) (alteration in original); see also Koon, 518 U.S. at 98, 116 S.Ct. at 2047 (explaining that the determination of whether a given factor is present to an exceptional degree must be made by comparing the facts of other Guidelines cases). Thus, while we must approach the issue by according the district court's determination "substantial deference" in accordance with the Supreme Court's decision in Koon, see Iannone, 184 F.3d at 227, we do not read Koon as constraining our role to the point that it would require us to uphold a district court's departure determination that is, in our opinion, a clear abuse of discretion. Here, based on the record presented, we conclude that the district court acted outside the boundaries of its discretion infinding extraordinary family ties and responsibilities warranting a departure under section 5H1.6.9

IV. CONCLUSION

For the foregoing reasons, we hold that Deneen Sweeting's family ties and responsibilities are not

_____

9. The government argues in the alternative that if we affirm the district court's initial decision to depart under 5H1.6, the court nonetheless acted unreasonably in granting the degree of departure that it did. Given our resolution of this appeal, it is not necessary for us to address in detail the government's argument on that second point. Nevertheless, we note that, while not critical to our analysis, we agree that the district court abused its discretion in awarding the degree of departure that it did. Unlike the situation in Gaskill where we found that there was a "lack of any end to be served by imprisonment other than punishment," see 991 F.2d at 86, imprisonment in this case would serve the important purposes underlying the Guidelines themselves--deterrence, incapacitation, just punishment and rehabilitation. See 1998 U.S.S.G. ch. 1, Pt. A, intro. As the PSI in this case reflects, Sweeting is a recidivist who came before the sentencing court with a Criminal History Category VI despite her relatively young age (age 31 on the date of her arrest). We think it is fair to say that some period of incarceration is necessary in this case to punish Sweeting for her most recent and very serious criminal conduct. Thus, we believe that the district court's sentence of five years probation with 12 months of home confinement wholly disregarded the extent of Sweeting's prior criminal history and the serious nature of her most recent illegal conduct.

31

"extraordinary" in the sense contemplated by section 5H1.6, and that she was not entitled to any downward departure on that basis. Accordingly, we will vacate the judgment of conviction and sentence entered in the district court on August 26, 1999, and will remand for resentencing consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit