UNITED STATES of America

v.

Steven SAFFER, Defendant.

Crim.A. No. 00–194–02.

United States District Court,
E.D. Pennsylvania.

Oct. 25, 2000.

John J. Pease, U.S. Attorney's Office, Philadelphia, PA, for Plaintiff.

Eugene J. Maurer, Jr., Wilmington, DE, for Defendant.

## MEMORANDUM & ORDER

Katz, Senior District Judge.

Defendant Steven Saffer pled guilty before this court to two counts of conspiracy, one count of making false statements to the Federal Aviation Administration (FAA), one count of mail fraud, and one count of obstruction of justice. In its sentencing memorandum and its letter of October 20, 2000, filed by Order of October 25, 2000, (Adjustment Ltr.), the government asked the court to impose a two-level upward adjustment to the defendant's offense level because his conduct involved the conscious or reckless risk of serious bodily injury. By letter to his probation officer, a copy of which was forwarded to this court and filed by Order of September 2, 2000, (Departure Ltr.), the defendant requested a downward departure due to extraordinary family ties and circumstances. Upon consideration of the parties' submissions, and after a hearing, the court grants the government's request for a two-level upward adjustment and denies the defendant's request for a downward departure.

## I. Background

### A. Offense Conduct

Mr. Saffer was district manager of Argenbright Security, Inc., a company that staffs pre-departure screening security checkpoints at the Philadelphia International Airport. At these checkpoints, passengers and their luggage are screened for metal and other suspicious objects before they are allowed to pass through to secured areas such as the concourse and gates. FAA regulations govern the pre-departure screening process and, *inter alia*, require that prospective screeners undergo an extensive background investigation, including verification of their previous five years of employment and a review of their last ten years of employment. Persons convicted of certain crimes may not be employed as screeners. In addition FAA regulations require that screeners receive twelve hours of initial classroom training, which includes training on operating the various scanning equipment and successful completion of a written test, as well as forty hours of on-the-job training. Screeners must receive annual retraining.

From approximately January 1995 until January 1999, Mr. Saffer, and two co-defendants who were acting under his direction, routinely flouted these regulations. The defendants failed to perform the required background checks, provided grossly inadequate training to screeners, and falsely certified that they had complied with FAA regulations. As a result of these actions, approximately 1,300 screeners hired by the defendants were improperly trained; at least fourteen of the screeners had criminal records. The foregoing conduct was the basis of one of the conspiracy counts and the false statement charge. In addition, Mr. Saffer and one of his co-defendants overbilled Argenbright's airline clients, which is the basis of the other conspiracy count and the mail fraud count. The obstruction of justice charge is based on Mr. Saffer's acts of hiding files and further altering records when the FAA began an investigation of Argenbright.

### B. Family Circumstances

Mr. Saffer is married with two children. While the defendant was the primary financial provider in the past, he has not worked since April of this year. All members of the family have medical problems of varying degrees. Mr. Saffer's three-

year-old daughter has a history of chronic intermittent diarrhea, has been diagnosed with asthma, and has exhibited symptoms of hyperactivity. Mrs. Saffer suffers from fibromyalgia, a condition that causes her chronic pain and fatigue. She has, however, been able to work approximately fifteen hours a week. Both Mr. and Mrs. Saffer are being treated for depression.

Mr. Saffer's eight-year-old son, Justin, was born with a bilateral cleft lip and complete cleft palate. He has undergone numerous surgical procedures to repair these conditions and require several more operations. Experts for both the defendant and the government agree that Justin has been traumatized by his medical problems and treatment, that his problems have caused him anxiety and difficulty in interacting with his peers, and that Mr. Saffer and his son have a strong, loving bond. The experts depart, however, in characterizing centrality of the role Mr. Saffer plays in his son's emotional and physical development.

The defendant's expert, Sandra J. Jones, is a social worker who has been treating Justin since December 1999 with both individual and family therapy. In June of this year, Ms. Jones reported that Justin may be suffering from depression and that he had "made statements such as. 'I want to kill myself,'" but denied feeling suicidal when questioned about these statements. Departure Ltr., Ex. B at 2.[1] Ms. Jones noted in August of this year that Justin had improved significantly—he appeared less depressed and anxious, and, due to his work in summer school, would not be required to repeat second grade. She attributed this improvement to Mr. Saffer's increased availability since he was no longer working. She concluded that the incarceration of his father would cause Justin to experience a "severe regression." Departure Ltr, Ex. C at 2.

The government's expert, Steven E. Samuel, is a licensed psychologist who evaluated Justin and interviewed his parents. Dr. Samuel concluded Ms. Jones' assessment of the effect of his father's incarceration on Justin was "too absolute, too general, and not tailor-made for what is ideologically significant to Justin's personality." Gov't Mem. of Law, Ex. A at 8. Dr. Samuel noted that Justin had several characteristics that made him resilient in the face of adversity, including his sense of being loved by his family, his ability to form attachments to others, and his ability to extract information "from his environment to help him deal with his life." *Id.* at 7. Dr. Samuel noted that in his evaluation Justin had "varied reactions to his father's increased presence" at home and that other factors contributing to his recent progress include his response to treatment with Ms. Jones, his growing maturity, and his emerging ability to emotionally distance himself from his past history of physical illness. *Id.* at 8. Dr. Samuel noted that, despite Justin's past remarks, Mrs. Saffer did not think that Justin would kill himself and that Justin himself stated that "he likes himself and that he does not think of himself that way anymore." *Id.* at 4. Based on his evaluation, Dr. Samuel concluded that Justin was not suicidal. *See id.*

## II. Discussion

### A. Conscious or Reckless Risk of Serious Bodily Injury Adjustment

■ According to the fraud guidelines, a defendant's offense level must be increased two levels if the offense involved "the conscious or reckless risk of serious bodily injury." U.S.S.G. § 2F1.1(b)(6)(A). The relevant inquiry is not whether actual injury occurred, but whether the defendant's conduct created a risk of such injury. *See United States v. Vivit,* 214 F.3d 908, 921 (7th Cir.2000). The government argues, and the court agrees, that "by knowingly assigning untrained, unquali-

---

**1.** Exhibits B and C of the Departure Letter are not numbered; for these two exhibits, the page number references are informal designations used by the court.

fied, untested and, in some cases convicted felons to work at the security checkpoints a Philadelphia International Airport, [Mr. Saffer] consciously and knowingly increased the risk that dangerous explosives, firearms, weapons or other forms of dangerous contraband would reach sterile areas of the airport and that an aviation disaster could occur." *See* Adjustment Ltr. at 1; *see also United States v. Turner*, 102 F.3d 1350, 1358–59 (4th Cir.1996) (affirming conscious risk of serious bodily injury fraud upward adjustment for defendants who falsely certified that mine workers had received eight hours of federally-mandated safety training). Consequently, the defendant's offense level is increased by two levels, resulting in a total offense level of 19 and a guidelines sentencing range of 30 to 37 months imprisonment.

### B. Family Ties and Responsibilities Departure

■ A court may depart downward from the applicable guideline range if it finds "a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0. A court must first determine whether the departure factor is forbidden, discouraged, or unmentioned by the Guidelines. *See Koon v. United States*, 518 U.S. 81, 94–96, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); *United States v. Iannone*, 184 F.3d 214, 226–27 (3d Cir.1999) (detailing 5K2.0 departure analysis to be employed after *Koon*); *United States v. Sally*, 116 F.3d 76, 80 (3d Cir.1997) (same). If the factor is discouraged, encouraged but already taken into the account by the applicable guideline, or listed as an appropriate consideration in applying an adjustment, a court can depart "only if the factor is present to an exceptional degree or in

some other way makes the case different from the ordinary case where the factor is present." *Koon*, 518 U.S. at 96, 116 S.Ct. 2035. A defendant's family ties and responsibilities is a discouraged factor.[2] *See* U.S.S.G. § 5H1.6; *United States v. Sweeting*, 213 F.3d 95, 100 (3d Cir.2000) (emphasizing that "a downward departure based on family ties and responsibilities should be the exception rather than the rule"). The defendant has the burden of production and persuasion on a request for downward departure. *See United States v. Higgins*, 967 F.2d 841, 846 n. 2 (3d Cir. 1992).

■ The defendant argues that his family ties and responsibilities are extraordinary because he is the primary provider of the family and plays an essential part in his son's emotional and physical development. The defendant points out that an important aspect of the former role is the provision of health insurance for the entire family, all of whom have conditions that require medical attention. The defendant also argues that his wife is in poor health and ill-equipped to shoulder the emotional and financial burdens of the family.

As a preliminary matter, the defendant's general role as head of his family does not take his case out of the heartland. "[T]he circumstance that [a defendant's] incarceration will disrupt the family unit cannot be considered atypical, inasmuch as innumerable other defendants no doubt could establish that their absence will cause a void in their children's lives.... 'Disintegration of family life in most cases is not enough to warrant a departure.'" *Sweeting*, 213 F.3d at 102 (quoting *United States v. Gaskill*, 991 F.2d 82, 84 (3d Cir. 1993)). In *Sweeting*, the Third Circuit held that a defendant's devotion to her children and her substantial positive influence on their lives did not make the case

---

**2.** The other discouraged factors are age; education and vocational skills; mental and emotional conditions; physical condition or appearance; employment record;; military, civic, charitable or public service, employ-ment-related contributions, and similar good works; and subjection to coercion or duress. *See* U.S.S.G. §§ 5H1.1–1.5, 5H1.11, 5K2.12; *see also Iannone*, 184 F.3d at 227 n. 10 (listing discouraged factors).

extraordinary such that a departure was warranted. *See id.* As the court recognized, in the cases of single-parent families even the danger that the children may end up in foster care due to lack of available relative relatives to care for them " 'is simply not out of the ordinary.' " *Id.* at 103 (quoting *United States v. Brand*, 907 F.2d 31, 33 (4th Cir.1990)).

The court acknowledges that in this case there is evidence in the record that suggests that Mrs. Saffer has physical and emotional constraints that would make difficult for her to assume the role of head of the family. Notwithstanding this concern, if the loss of the only parent and the accompanying breakup of the family unit is not extraordinary, then the loss of one parent in a two-parent household may not necessarily be grounds for departure, even when there is a possibility that the remaining parent may not be able to care for the family. *See United States v. Abbott*, 975 F.Supp. 703, 709 (E.D.Pa.1997) (ruling on collateral appeal and holding that even had defendant made a motion for departure due to family circumstances, the motion would have been denied despite evidence that defendant's wife and mother were medically unable to care for defendant's children).

That Mr. Saffer was the primary financial provider of his family also does not take his case out of the heartland. In *Sweeting*, the defendant's role as the sole provider for her five children did not provide a basis for departure. *See id.* at 103. The fact that Mr. Saffer's past employment has provided the family with health insurance does not make this case extraordinary; it is simply another type of support that is generally provided by the head of a household. Again, a family's loss of the primary or sole provider is a tragic but commonplace effect of the incarceration of a parent and spouse. While the court does not wish to minimize the adversity Mr.

Saffer and his family are facing, his situation is more the norm than the exception.

▪ The effect of Mr. Saffer's incarceration on the emotional and psychological state of his son presents a more difficult case. After consideration of all evidence of record, and weighing the somewhat contradictory reports of the experts, the court finds that this aspect of Mr. Saffer's case is not outside of the heartland. A defendant's indispensable role in caring for a seriously ill relative may be grounds for a departure. *See Gaskill*, 991 F.2d at 86. Where, however, the defendant's role may be filled by another person, a departure is not warranted. *See Sweeting*, 213 F.3d at 105, 108 n. 5. For example, in *Gaskill*, the defendant was the sole caretaker of his mentally ill wife and had given up a lucrative job in order to take on this responsibility. *See* 991 F.2d at 84, 86. The court found that not only was Mrs. Gaskill unable to care for herself, but that there was no other member of the family who could assume the defendant's role. *See id.* at 86. In *Sweeting*, the defendant, whose eldest son suffered from Tourette's Syndrome, argued that she was essential to her son's continued health and well-being because she ensured that her son followed a exercise and diet program that controlled his symptoms. *See Sweeting*, 213 F.3d at 104. In rejecting this argument, the court found that "there simply is nothing about the type of care that [the defendant's son] requires that suggests to us that it is so unique or burdensome that another responsible adult could not provide the necessary supervision and assistance in Sweeting's absence." *Id.* at 105.

The court finds the defendant's family situation is more akin to that in *Sweeting* than that in *Gaskill*.[3] While the record

---

**3.** The other considerations informing the Third Circuit's recognition that a departure in *Gaskill* would be appropriate do not weigh in

favor of granting a departure in this case. The *Gaskill* court noted that the defendant's minimum pre-departure sentence was eight

indicates that Mr. Saffer is a positive influence in his son's development, the evidence does not show that he is the only figure in his son's life who can provide Justin with support and guidance. Both experts note that Justin is close to both his parents. While Ms. Jones has suggested that Mr. Saffer's presence in the home due to his unemployment has contributed to Justin's improvement over the past months, this statement is not support by any concrete discussion of how Mr. Saffer has increased his interactions with his son. It is also undercut by the fact that Mr. Saffer has been out of work since April, while the progress noted by Ms. Jones took place from June to August. In addition, according to the government's expert, while Justin's descriptions of his relationship with his father depict a close and positive one, they do not indicate that Mr. Saffer has taken an active, affirmative role in helping Justin address his medical problems and any accompanying social difficulties. *See* Gov't Mem. Ex. A at 3, 5 (noting that Justin relies on his father for male-oriented activities such as participation in sports and that his father reads to his son at bedtime but that Justin describes his father's primary activities since leaving work as eating and watching television; noting

that, generally, Justin has a tendency to prefer his mother). While the court certainly does not suggest that the temporary loss of Mr. Saffer will not have a profound effect on his son, it cannot conclude this situation is extraordinary. Any child facing the loss of a parent may be devastated and while Justin has already faced more adversity than most children his age, the weight of the evidence does not suggest that the presence of his father is indispensable to his continued development.[4]

Finally, the court acknowledges that Ms. Jones expressed concerns in June regarding the possibility that Justin may be suicidal. This concern, however, was based on remarks that both Justin and his mother have discounted, and recent evaluations of Justin by Ms. Jones and by Dr. Samuel paint a more positive picture. *See* Departure Ltr., Ex. C at 2 (noting in August 2000 that Justin has made significant process since June); Gov't Sent. Mem. Ex. A at 4 ("There is no evidence in his interview or psychological testing evaluation data consistent with Justin's being suicidal."). Given that the defendant bears the burden of proof, the high bar he faces in demonstrating that his family circumstances are extraordinary, and the evidence showing that currently, Justin is not suicidal, the

---

months, requiring only a slight departure in order to impose a non-custodial sentence; it also distinguished the defendant's offense, fraudulent use of social security numbers which was motivated by the defendant's desire to allow his wife to engage in shopping sprees, from violent or serious transgressions such as large-scale drug dealing. *See id.* 991 F.2d at 85–86.

In contrast, with an offense level of 19 and a criminal history category of I, Mr. Saffer faces a minimum sentence of 30 months. Thus, the court would have to make a nine-level departure in order to avoid imposing a sentence of imprisonment. *See* U.S.S.G. §§ 5B1.1(a), 5C1.1(c) (allowing a sentence of home detention and probation for offense levels in Zone B); *id.*, Ch. 5 Pt. A (Sentencing Table) (indicating that Zone B begins at offense level 10 for defendants with a criminal history category of I). While Mr. Saffer's offenses did not expose his family to any risk, as discussed, it was conduct that posed an

inherent risk to many others and spanned several years. The court cannot equate this conduct with the relatively benign actions of the defendant in *Gaskill*.

4. As noted by the Third Circuit, several of the other cases relied upon by the defendant, *United States v. Haversat*, 22 F.3d 790 (8th Cir.1994), *United States v. Sclamo*, 997 F.2d 970 (1st Cir.1993), and *United States v. Alba*, 933 F.2d 1117 (2d Cir.1991), can all be distinguished on the grounds that the defendants in those cases had been found to play an essential and irreplaceable role in caring for a family member. *See Sweeting*, 213 F.3d at 108 n. 5. In addition, *United States v. Big Crow*, 898 F.2d 1326 (8th Cir.1990), upon which the defendant also relies, is distinguishable since in that case the court granted a departure based on a combination of factors, including the defendant's employment history, the difficulties he faced growing up on the Pine Ridge reservation, his support of his family, and his community ties.

court concludes that this consideration does not take the case out of the heartland. *Cf. United States v. Lopez,* 28 F.Supp.2d 953, 955–56 (E.D.Pa.1998) (departing due to family circumstances where defendant's seven-year-old daughter had been hospitalized for an attempted suicide after her mother's arrest and where there was a high risk that a sentence within the guidelines range would result in the termination of the defendant's parental rights).

III. Conclusion

The defendant's offense level is increased by two-levels because his fraudulent conduct involved the conscious or reckless risk of serious bodily injury. While the court recognizes that it has the discretion to depart from the Sentencing Guidelines under U.S.S.G. §§ 5K2.0 and 5H1.6, it will not do so in this case because the defendant's family ties and circumstances are not extraordinary.

### ORDER

**AND NOW**, this 25th day of October, 2000, upon of the government's request for a two-level upward adjustment contained in its sentencing memorandum and October 20, 2000, letter to the court, filed by Order of even date, and the defendant's request for a downward departure, contained in his August 25, 2000, letter to Ms. Rachel A. Kolvek and its attachments, filed by Order of September 2, 2000, the other submissions of the parties, and after a sentencing hearing, it is hereby **ORDERED** as follows:

1. The government's request for a two-level upward adjustment is **GRANTED**. The Presentence Investigation Report is modified to indicate that the defendant's total offense level is increased by two-levels for conduct that involved the conscious or reckless risk of serious bodily injury. *See* U.S.S.G. § 2F1.1(b)(6)(A). Consequently, the defendant's total offense level is 19 and his sentencing range is 30 to 37 months imprisonment.

2. The defendant's request for a downward departure pursuant to U.S.S.G. §§ 5K2.0 and 5H1.6 is **DENIED**.