**UNITED STATES of America,**

**v.**

**Pasquale DETOMMASO, Defendant.**

No. 00–133–1.

United States District Court,
E.D. Pennsylvania.

Dec. 14, 2000.

---

138

Robert Zauzmer, U.S. Atty's Office, Philadelphia, PA, for plaintiff.

Solomon Fisher, Philadelphia, PA, for defendant.

## MEMORANDUM AND ORDER

KATZ, Senior District Judge.

Defendant Pasquale DeTommaso pled guilty before this court to three counts of making false declarations on his tax returns, in violation of 26 U.S.C. § 7206(1). The government and the defendant agree that the offense level for sentencing purposes is 13,[1] which provides a sentencing range of 12 to 18 months as the defendant has no prior criminal history. *See* U.S.S.G. §§ 2T1.1 and 2T4.1. Mr. DeTommaso now seeks a downward departure from the applicable Guidelines range. Upon consideration of the parties' submissions, and after a hearing, the court denies the defendant's request for a downward departure.

### I. Background

Mr. DeTommaso is a 45 year old first-time offender whose tax-fraud crimes pertain to unreported income generated by his former pizza restaurant, which was located in Hatfield, Pennsylvania. Mr. DeTommaso married Janice Bell in 1988 and the couple had two children, Vincent, now age 11, and Nicholas, now age 10. The couple separated and divorced in the mid–1990s; after the divorce, the boys' parents shared joint custody, and Mr. DeTommaso regularly visited with his sons several times a week. On December 7, 1995, Ms. Bell was tragically murdered in her home in New Jersey. The murder has not been solved.

After Ms. Bell's death, Ms. Bell's sister and brother-in-law, Joan and Timothy Dombrowski, petitioned for custody of the two boys. The court ultimately awarded sole custody to the defendant, but also granted the Bell family liberal rights to share in the boys' lives. As a result, the boys currently live with their father, their

1. The guilty plea agreement, filed on September 11, 2000 and amended on November 15, 2000, specifies that the uncontested base offense level for these crimes is 15, which reflects a tax loss of more than $120,000 but not more than $200,000. *See* U.S.S.G. §§ 2T1.1 and 2T4.1. The amended plea agreement also stipulates that the defendant is entitled to a two-level reduction under Section 3E1.1 for acceptance of responsibility, bringing the offense level to 13. Mr. DeTommaso reserved the right in his amended plea agreement to seek a downward departure based on family circumstances.

paternal uncle, and their paternal grandmother in Maryland when school is in session, and also every other weekend, half of every summer, and half of each extended holiday period. All three of the adults in Mr. DeTommaso's household are regularly involved in caring for the boys, although Mr. DeTommaso has reported that he is principally responsible for their routine daily care, including seeing them off to school and picking them up after school, and, as his working hours are flexible, spending afternoons and evenings with them as well.

In addition, since 1996, the boys have spent every other weekend, and the remaining halves of their summers and holiday periods, with extended family on their mother's side. The adults on their mother's side of the family who are active in their lives include their grandparents, the Dombrowskis, and another aunt and uncle. Ms. Dombrowski testified that she is prepared to take care of her nephews if Mr. DeTommaso is incarcerated. Ms. Dombrowski is a former teacher, her husband is an internist, and the couple has two children of their own. Joan Bell, the grandmother of the boys, also testified that she is available to help with the children, if defendant is incarcerated.

The two children have been evaluated and treated by mental health and other professionals on various occasions.[2] Two months after the murder, a psychologist engaged in a series of sessions with the boys, but deemed them too young to be involved in psychotherapy. In 1996 and 1997, they underwent two different child custody evaluations; the 1997 evaluation definitively concluded that Vincent, the older of the two boys, was depressed, and that both boys should see therapists. Also in 1997, Vincent and Nicholas engaged in individual psychotherapy with another doctor, who found that Vincent was experiencing both anxiety and depression, and that Nicholas' anxiety problems could be suffi-

ciently severe to warrant psychopharmacological intervention. However, this intervention was not taken.

Most recently, the boys met on two occasions with Dr. Eliot Atkins and an associate of Dr. Atkins, who interviewed the boys and administered various tests. While the test results were not conclusive, Dr. Atkins reported that Vincent displayed above-average intellectual functioning, that his reasoning, judgment and memory were all intact, but also that his "affect was rather blunted and his mood was somewhat tense and depressed." Letter from Atkins to Fisher of 10/16/00, at 3. The tests for Nicholas, Dr. Atkins reported, determined that the younger boy is suffering from below-average adaptive capacities, such as displays of childish behavior when he is asked about his mother, and that he is at risk for recurrent episodes of depression as well as subject to feelings of loneliness and emotional deprivation. Consistent with earlier evaluations, Dr. Atkins also described both boys as defensive and unwilling to discuss their mother or the circumstances of her death.

Dr. Atkins drew extensively upon psychological literature in support of the principle that "it is the role played by the surviving parent that matters most to children in the aftermath of the murder of a parent." *Id.* at 9. Dr. Atkins concluded that "[i]t is abundantly clear ... that both Vincent and Nicholas would be significantly and adversely affected by the loss of their father from their lives. His emotional presence in their lives is clearly vital to their continued psychological functioning and emotional well-being." *Id.* at 5.

## II. Discussion

 A court may depart downward from the applicable guideline range if it finds "a mitigating circumstance of a kind, or to a degree, not adequately taken into

---

**2.** These evaluations were summarized by Dr. Eliot Atkins in his letter report dated October 16, 2000, and filed with the court.

consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0. A court must first determine whether the departure factor is forbidden, discouraged, or unmentioned by the Guidelines. *See Koon v. United States,* 518 U.S. 81, 94–96, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); *United States v. Iannone,* 184 F.3d 214, 226–27 (3d Cir.1999) (detailing Section 5K2.0 departure analysis to be employed after *Koon* ); *United States v. Sally,* 116 F.3d 76, 80 (3d Cir.1997) (same).

■■ A defendant's family ties and responsibilities are a discouraged factor. *See* U.S.S.G. § 5H1.6; *United States v. Sweeting,* 213 F.3d 95, 100 (3d Cir.2000) (emphasizing that "a downward departure based on family ties and responsibilities should be the exception rather than the rule"). Since family circumstances are discouraged as a factor in the sentencing process, a court can depart "only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Koon,* 518 U.S. at 96, 116 S.Ct. 2035. The defendant has the burden of production and persuasion on a request for downward departure. *See United States v. Higgins,* 967 F.2d 841, 846 n. 2 (3d Cir.1992).

■ It first must be noted that "the circumstance that [a defendant's] incarceration will disrupt the family unit cannot be considered atypical, inasmuch as innumerable other defendants no doubt could establish that their absence will cause a void in their children's lives.... 'Disintegration of family life in most cases is not enough to warrant a departure.'" *Sweeting,* 213 F.3d at 102 (quoting *United States v. Gaskill,* 991 F.2d 82, 84 (3d Cir.1993)). This general principle is applicable even in cases where the defendant is a single parent. In *Sweeting,* the Third Circuit held that a defendant's devotion to her children as the sole parent, and her substantial positive influence on their lives, did not

make the case extraordinary such that a departure was warranted. *See id.*

On the other hand, the Third Circuit has also held that a defendant's indispensable role in caring for a seriously ill relative may be grounds for a departure. *See Gaskill,* 991 F.2d at 86. In *Gaskill,* the defendant was the sole caretaker of his mentally ill wife and had given up a lucrative job in order to take on this responsibility. *See id.* at 84, 86. The court found that not only was Mrs. Gaskill, who spent sixteen hours a day in bed, was unable to attend to certain basic needs such as medicating herself, but that there was no other member of the family who could assume the defendant's role as her illness had completely alienated her from all other friends and family. *See id.* at 86. Mr. DeTommaso cites to cases in other Circuits that have permitted departures in instances where the defendant played an similarly indispensable role in providing emotional support, as opposed to the physical support provided in *Gaskill. See, e.g., United States v. Haversat,* 22 F.3d 790 (8th Cir. 1994); *United States v. Sclamo,* 997 F.2d 970 (1st Cir.1993).

■ Mr. DeTommaso points to the emotional fragility of his two young sons, and argues that he is an indispensable element in their well-being. It is indisputable that the two boys are struggling with the tragic loss of their mother and the consequences of her violent death, and the court does not wish to minimize the hardship they bear or the additional loss they will suffer upon Mr. DeTommaso's incarceration. Mr. DeTommaso undoubtedly plays an important role as the surviving parent, and he appears to be a responsible caregiver as well as emotionally supportive of his children. The disruption of normal family relations, even where the defendant is a single parent who has a substantial positive influence on her children, is not generally recognized under the law as atypical or extraordinary. *See Sweeting,* 213 F.3d at 102 (citing *United States v. Shoupe,* 929 F.2d 116 (3rd Cir.1991)). The court recognizes

that the case before it presents an additional factor for consideration, which is that the defendant is not merely a single parent but a single parent of two young children who continue to cope with the brutal and unsolved murder of their mother. However, while the court understands that it may exercise its discretion to depart in this case under U.S.S.G. §§ 5K2.0 and 5H1.6, it declines to do so.

Significantly, the Third Circuit has held that where the defendant's role may be filled by another person, a departure is not permitted. *See Sweeting,* 213 F.3d at 105, 108 n. 5. In *Sweeting,* the defendant, whose eldest son suffered from Tourette's Syndrome, argued that she was essential to her son's continued health and well-being because she ensured that her son followed a exercise and diet program that controlled his symptoms. *See Sweeting,* 213 F.3d at 104. In rejecting this argument, the court found that "there simply is nothing about the type of care that [the defendant's son] requires that suggests to us that it is so unique or burdensome that another responsible adult could not provide the necessary supervision and assistance in Sweeting's absence." *Id.* at 105; *cf. Gaskill,* 991 F.2d at 86 (granting departure where the defendant's wife required daily care due to her mental illness, and where the illness had alienated her from all family members except for the defendant).

This aspect of the *Sweeting* case involved a physical dependency that is by nature easier to replace than an emotional bond, and in this case the children's emotional reliance on their father is no doubt intensified because of the loss of their mother. However, even after accounting for these distinctions, it remains that Mr. DeTommaso has not demonstrated that the boys' emotional needs cannot be met by the well-developed, extensive network of other family members that has helped to support the children for a generous portion of their short lives. Mr. DeTommaso's own household includes two other adults, Mr. DeTommaso's brother and mother, who are regularly involved in his children's daily lives. Vincent and Nicholas also have the benefit of three other adult couples on their mother's side of the family with whom they have spent half of their free time (i.e., when school is not in session) during each of the past four to five years; this arrangement was deemed appropriate by the court which conducted extensive custody proceedings. It is not disputed that these family members are fully and competently supportive of the boys. The children's aunt is willing to take care of the children and place them in her home with her husband and their two children.[3] By way of comparison, even in cases where the defendant is the head of a single-parent family and the defendant's children may end up in foster care, where no established emotional bonds have yet been forged, the Third Circuit has found that such hardship " 'is simply not out of the ordinary' " and does not warrant a departure. *Id.* at 103 (quoting *United States v. Brand,* 907 F.2d 31, 33 (4th Cir. 1990)). In this case, the circumstances are not nearly as dire but, to the contrary, provide more than adequate assurances that the children will be cared for by numerous family members with whom the children have already developed close bonds over a time span of several years. Thus, the defendant's situation does not call for a departure.

Furthermore, other than the general studies cited by Dr. Atkins that emphasize the important role of a surviving parent in the aftermath of an unnatural death, and other than evidence that Mr. DeTommaso is a dedicated father who is integrated in the daily lives of this sons, no credible evidence sufficiently demonstrates that ei-

---

3. The court has no opinion as to the merits of the custody issues, although it does have sympathy for the trauma of the children were they to become the subject of another legal battle. It is apparent that there are hard feelings between the defendant and the Bell family.

ther of the boys' basic emotional health utterly and absolutely depends on Mr. DeTommaso's daily availability and freedom from incarceration. Dr. Atkins's testimony and report conclude only that the children suffer from mild to moderate depression and/or anxiety, and do not include any discussion as to the actual nature, strength or depth of the emotional relationship between Mr. DeTommaso and his sons; therefore a sufficiently specific basis has not been credibly established for a finding that incarceration will threaten his children's fundamental mental health so severely as to warrant a departure. *Cf. United States v. Lopez,* 28 F.Supp.2d 953, 955–56 (E.D.Pa.1998) (departing where defendant's arrest led to a suicide attempt by her seven-year-old daughter that required hospitalization). Although a strong fatherson bond is by nature unique and close to irreplaceable, and is particularly important in view of the mother's unnatural death, a degree of dependence so singular and extraordinary as to warrant a departure has not been credibly demonstrated. This is especially true when considered in the context of the many people who have committed themselves in the past to the children's upbringing and promise to do so in the future, even though Dr. Atkins did not address the role played by the children's extended family in their emotional and mental health.

Finally, the defendant points out that the other considerations informing the Third Circuit's decision to depart in *Gaskill* are also present in this case. The *Gaskill* court noted that the defendant's minimum pre-departure sentence was eight months, requiring only a slight departure in order to impose a non-custodial sentence. *See Gaskill,* 991 F.2d at 85–86. Similarly, in this case a relatively slight 12–month departure would permit the imposition of a non-custodial sentence. *Gaskill* also distinguished the nature of the defendant's offense, the fraudulent use of social security numbers, from violent or serious transgressions such as large-scale drug dealing. *See id.* Similarly, in this case the defendant's offense of tax fraud is a nonviolent crime. However, these factors, as considered in *Gaskill,* were not in themselves wholly independent bases for the decision to depart, but were factors considered in addition to the defendant's wife's utter and absolute dependence on the defendant, and on the defendant alone, for the essential elements of survival. Evidence has simply not established that core factor to be present in this case.