

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-26-2001

# United States v. Yeaman

Precedential or Non-Precedential:

Docket 00-1498

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"United States v. Yeaman" (2001). *2001 Decisions.* Paper 92.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/92

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 26, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 00-1498 and 00-1500

UNITED STATES OF AMERICA
Appellant in Nos. 00-1498 and 00-1500

v.

DAVID REX YEAMAN, Appellee in No. 00-1498
NOLAN LEIGH MENDENHALL, Appellee in No. 00-1500

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Crim. Action Nos. 96-cr-00051-3 and 96-cr-00051-6)
District Judge: Honorable Clarence C. Newcomer

Argued December 14, 2000

BEFORE: NYGAARD and STAPLETON, Circuit Judges, and
DEBEVOISE,* District Judge

(Opinion Filed: April 26, 2001)

Robert A. Zauzmer
Andrea G. Foulkes (Argued)
Office of the U.S. Attorney
615 Chestnut Street
Philadelphia, PA 19106
 Attorneys for Appellant

_____

* Honorable Dickinson R. Debevoise, United States District Judge for the
District of New Jersey, sitting by designation.

Frank C. Razzano (Argued)
Dickstein, Shapiro, Morin &
 Oshinsky
2101 L Street, N.W.
Washington, DC 20037
 Attorney for Appellee
David Rex Yeaman

Patrick J. Egan (Argued)
Donohue and Donohue
232 South Fourth Street
Philadelphia, PA 19106
 Attorney for Appellee
Nolan Leigh Mendenhall

OPINION OF THE COURT

STAPLETON, Circuit Judge:

The United States government appeals the sentences of David Yeaman and Nolan Mendenhall on several counts of mail and wire fraud. We reversed the original sentences of both defendants following a previous gover nment appeal, finding that the District Court had failed to apply the Sentencing Guidelines properly. United States v. Yeaman, 194 F.3d 442, 465 (3d Cir. 1999). At r esentencing, the District Court departed downward 17 levels for Yeaman and 16 levels for Mendenhall primarily because both defendants had already completed erroneously lenient sentences. The downward departures granted by the District Court resulted in no additional incarceration. W e conclude that the District Court has again erred, and we will again remand for resentencing.

I.

David Yeaman and Nolan Mendenhall wer e convicted on several counts of mail and wire fraud arising from their participation in a fraudulent scheme involving the sale of worthless reinsurance. The details of the scheme are set forth in our opinion in United States v. Y eaman, 194 F.3d 442, 446–49 (3d Cir. 1999). Briefly stated, the convictions of

2

Yeaman and Mendenhall stemmed from their leasing worthless stocks as assets available to pay insurance claims. When these assets were called upon to pay outstanding medical reinsurance claims, the scheme was uncovered. David Yeaman leased stocks which were purported to be valued at over $12 million but wer e in fact practically worthless. Mendenhall assisted Y eaman in leasing these falsely-valued stocks and ran the day-to-day operations of the scheme. Id.

Yeaman was convicted by a jury in 1997 of conspiracy to commit securities fraud and wire fraud, in violation of 18 U.S.C. S 371, five counts of wire fraud, in violation of 18 U.S.C. S 1343, and three counts of securities fraud, in violation of 15 U.S.C. S 77q(a). Mendenhall was convicted of four counts of securities fraud, in violation of 15 U.S.C. S 77q(a). Three co-defendants wer e also convicted at trial, while a sixth co-defendant pled guilty and testified against the other defendants.

At its first sentencing hearing on January 28, 1998, the District Court sentenced Yeaman to 14 months imprisonment and Mendenhall to three years pr obation, with Mendenhall's first 10 months to be served in community confinement. The defendants appealed these sentences and the government cross-appealed. On appeal, this Court remanded for resentencing, holding, inter alia, that the District Court had erred by finding that no loss had occurred. On remand, Yeaman and the government agreed to a modified offense level of 30, based on the $4.5 million loss incurred and other factors. This produced a sentencing range of 97 to 121 months for Yeaman, a range mandating a sentence 83 months (roughly 7 years) longer than his prior sentence. Mendenhall and the gover nment agreed to an offense level of 26, also based on the loss and other factors. This produced a sentence range of 63 to 78 months, in comparison to a previous sentence r equiring no jail time, but only community confinement.

At the resentencing hearing on April 10, 2000, the District Court found that these ranges were appropriate and that they were supported by the facts. The District Court then departed downward 17 levels for Y eaman and 16 levels for Mendenhall in order to re-impose its original

3

sentences. Before either party had addr essed the merits, the District Court made clear its intention to avoid imposing any punishment beyond the original sentences.

> Let me say at the outset that this is an unusual situation in that we have two defendants her e who had been sentenced previously and who were each sentenced to periods of incarceration which they entered upon and completed and served and then entered upon their supervised release and their resumption of their civilian pursuits.
>
> . . .
>
> I must say, in all candor, that my view of this is that, as a judge, if he were in a position of applying justice and mercy, as it's traditionally been known, would feel that after this long delay, it is almost unconscionable to send these two defendants back to prison.

(App. 162a-66a).

After hearing arguments by the government and both defendants, the District Court re-imposed its original sentences.

II.

The parties have suggested four bases for the District Court's downward departures: extraor dinary rehabilitation, disparity in sentencing among similarly situated co-defendants, extraordinary family circumstances, and re-incarceration after completion of a sentence. The government argues that on the facts of this case, a departure based on any of the above factors is unwarranted.

"We review a district court's decision to depart from the applicable Guidelines range under an abuse of discr etion standard . . .." United States v. Sweeting, 213 F.3d 95, 100 (3d Cir. 2000), citing Koon v. United States, 518 U.S. 81, 98 (1996). "Our review is limited to ensuring that the circumstances relied upon by the District Court are not `so far removed from those found exceptional in existing case law that the sentencing court may be said to be acting

4

outside permissible limits.' " United States v. Serafini, 233 F.3d 758, 772 (3d Cir. 2000) quoting Sweeting, 213 F.3d at 100.

However, we also note that "whether a factor is a permissible basis for departure under any circumstances is a question of law, and the court of appeals need not defer to the district court's resolution of the point." Koon, 518 U.S. at 100. Thus, while we owe deference to the District Court's interpretation of the facts warranting departure in this case, we may correct the District Court's legal error if we find that it has departed based on a factor which would not warrant departure under any circumstances.

1. Extraordinary Rehabilitation

In United States v. Sally, 116 F.3d 76 (3d Cir. 1997), we held that "post-offense rehabilitation efforts, including those which occur post-conviction, may constitute a sufficient factor warranting a downward departure provided that the efforts are so exceptional as to remove the particular case from the heartland in which the acceptance of responsibility guideline was intended to apply." Id. at 80. (Emphasis is original). These rehabilitation ef forts must be remarkable, "indicate real, positive behavioral change," and demonstrate the defendant's "commitment to r epair and rebuild" his or her life. Id. at 81; see also United States v. Hancock, 95 F. Supp. 2d 280, 287 (E.D. Pa. 2000) (declining to grant a Sally departur e based on defendant's post-offense work record, wher e defendant was a college graduate and held noteworthy employment prior to arr est); United States v. Kane, 88 F. Supp. 2d 408, 409 (E.D. Pa. 2000) (noting it is inappropriate to grant a departure where the defendant simply engages in good conduct consistent with pre-offense activities).

Though the District Court did not explicitly state it was departing downward on the basis of extraor dinary rehabilitation, it is clear that the court was aware that extraordinary rehabilitation was an available basis for departure pursuant to our decision in Sally . The District Court did state that "the record of both individuals while in custody was exemplary and reflected a concentrated attitude of rehabilitation and cooperation" and that

5

"additional imprisonment would result in disruption of their rehabilitative efforts."

The government notes that the most recent version of the Sentencing Guidelines has been amended to forbid expressly downward departures based on post-sentencing rehabilitation. The Sentencing Commission deter mined that such departures were inconsistent with 18 U.S.C. S 3624(b) (providing for sentence reductions due to good behavior) and impermissibly benefitted only those who were granted resentencing de novo. U.S.S.G. S 5K2.19. We note that the amended guidelines were not effective at the time of the sentencing of these defendants and that they work a departure from our previous interpr etation of U.S.S.G. S 5K2.19 in Sally. They are ther efore a substantive amendment, rather than a clarification of U.S.S.G. S 5K2.19. See U.S. v. Bertoli, 40 F .3d 1384, 1407 n.21 (3d. Cir. 1994) (stating that this Court's interpr etation of the pre-amendment language is the controlling factor in determining whether an amendment is mer ely "clarifying."). We, therefore, conclude that a Sally departure is available, at least in theory, to these defendants.

It is clear from the record befor e us, however, that the defendants here are not eligible for a Sally departure. Neither Yeaman or Mendenhall has intr oduced evidence of extraordinary rehabilitation. Mendenhall's three proffered examples of rehabilitation are not significant. First, Mendenhall's parole officer stated that his behavior was "likely aberrant and not likely to be repeated." Second, Mendenhall points out that he is attempting to become an architect. Third, after being released from community confinement, Mendenhall sought counseling fr om a police lieutenant.

The statement of the parole officer har dly amounts to evidence of extraordinary rehabilitation, and Mendenhall's career change is not at all surprising, as he has a Master's Degree in architecture and would pr esumably have faced difficulty obtaining employment in the securities industry subsequent to his conviction. The only evidence that speaks to rehabilitation at all is Mendenhall's pursuit of counseling. Pursuit of counseling is included as a factor weighing toward proof of acceptance of r esponsibility under

6

U.S.S.G. S 3E1.1. The fact that it is a factor weighing in favor of a guideline-based departure makes it clear that standing alone, it is not "extraordinary" unless there is some evidence that it was somehow present to an extraordinary degree in this case. No such evidence is present in the record. Accordingly, we can find no basis in the record supporting a Sally departure for Mendenhall as he has pointed to nothing "remarkable" or"exceptional" in his rehabilitation as is required by our jurisprudence.

Turning to Yeaman, the recor d makes clear that he learned Spanish, participated in the prison choir, tutored other inmates, and generally behaved as a "model prisoner." As a reward for this good behavior , Yeaman was released early from his confinement at Nellis Prison Federal Prison Camp and transferred to community confinement to serve the last few months of his original sentence. While Yeaman's activities, especially the tutoring of fellow inmates, were commendable, they do not support a finding of extraordinary rehabilitation. Befor e his original sentencing, Mr. Yeaman made clear that he is an individual with strong religious convictions who would not be inclined to engage in unlawful activity in the future. 1 Yeaman's

_____

1. Relatedly, we note the following statement by the District Court:

> Since [defendants'] release they have, by all accounts, been model, productive citizens, resulting in numer ous letters of support from relatives, friends, employers and community members. Any additional imprisonment would result in disruption of their rehabilitative efforts, their relationships with family members, which have been strained and are now being str engthened, and would cause substantial economic hardship on the defendants and their families.

> The letters mentioned were made part of the appendix, presumably in support of Yeaman's claim of extraordinary rehabilitation. The majority of these letters simply indicate that Yeaman's family and community believe he is a good person and believe he has been punished sufficiently. Such sentiments, though attesting to Yeaman's many admirable qualities, do not form an adequate basis for downward departure under the Sentencing Guidelines. Accord U.S.S.G. S 5H1.6 (stating that community ties are ordinarily irrelevant to sentencing); United States v. Rybicki, 96 F.3d 754, 758 (4th Cir. 1996) (finding that personal worthiness does not constitute a valid basis for downward departur e); cf. United States v. Serafini, 233 F.3d at 763 (exceptional civic and charitable

contributions may form a basis for departur e).

7

behavior subsequent to sentencing confirms this fact but also makes it clear that Yeaman's conduct has not changed significantly and could have been reasonably expected based on his previous behavior. Insofar as the District Court concluded that extraordinary rehabilitation occurred in Yeaman's case, it abused its discr etion. There is nothing about Yeaman's post-sentencing conduct that sets it outside the heartland and makes it a basis for a Sally departure.[2]

2. Sentencing Disparity

The District Court stated that "imposing what is concededly a substantial downward departur e . . . would tend to make the sentences more compatible with the defendant's other cohorts in this scheme for which the defendants have been found guilty, and would mor e fairly level the playing field." The defendants suggest that the District Court departed downward on the basis of sentencing disparity.

We are not certain that the defendants have read the District Court's statement correctly. It is possible that the District Court was merely observing an ef fect of its downward departure rather than providing an additional basis for the departure. If it were true that this were a basis for departure, however, we would not be able to sustain such a basis on these facts. The record makes it clear that two of the defendant's cohorts received sentences more severe than those properly applicable to Y eaman and Mendenhall.[3] Additionally, the government makes a

_____

2. Yeaman's counsel argues that United States v. Green, 152 F.3d 1202 (9th Cir. 1998) is nearly on all fours supporting a downward departure. Green involved a 14-level downwar d departure for a person convicted of a marijuana-related offense in Califor nia, who served 3000 hours of community service, and in addition made himself "available for daily tutoring, weekend special events, out therapy pr ogram, and was instrumental in starting Saturday computer training programs." Id. at 1208. This kind of involvement might be seen as extraordinary and is distinguishable from Yeaman's conduct, which does not demonstrate extraordinary initiative or change in behavior.

3. Alan Teale pled guilty and was sentenced to seven years in Pennsylvania, and then ten years consecutively in Alabama. He died in prison. Charlotte Rentz pled guilty and was sentenced to six years in Pennsylvania and an additional seven years in Alabama.

8

compelling argument that the variation in sentences between the defendants here and their co-defendants may be explained by the fact that all co-defendants pr esented by the defendants pled guilty and many of them cooperated with the government's investigation and pr osecution. Generally, disparities in sentences among similarly situated defendants do not constitute a valid basis for downward departure in the absence of any proof of prosecutorial misconduct. United States v. Higgins, 967 F .2d 841, 845 (3d Cir. 1992). In fact, several other cir cuits have rejected challenges to shorter sentences for similarly situated co-defendants when the shorter sentences were a r esult of plea bargaining or government assistance. See, e.g., United States v. Epley, 52 F.3d 571, 584 (6th Cir. 1995); United States v. Stanley, 928 F.2d 575, 582-83 (2d Cir. 1991).

We have held that a manipulation of an indictment by the prosecution may provide a basis for a downward departure. See United States v. Lieberman, 971 F .2d 989, 998-99 (3d Cir. 1992). Although Yeaman and Mendenhall suggest many inconsistencies between their sentences and the sentences of their co-defendants, their arguments ar e based on an ambiguous comment by the District Court that makes no reference to specific facts. Lacking anyfindings of fact from the District Court as to which co-defendants wer e similarly situated and how the government committed pr osecutorial misconduct, it is impossible for us to deter mine if and why the District Court intended to depart downwar d on the basis that some sentences were dissimilar . In the absence of any factual findings of specific disparities or prosecutorial misconduct, the departures challenged by the government cannot be sustained on the basis of sentencing disparity.

3. Family Circumstances

We note briefly that the District Court stated that reincarceration would result in "disruption of . . . [defendants'] relationships with family members, which have been strained and are now being str engthened" and "substantial economic hardship on . . .[defendants'] families." This suggests to us that family cir cumstances may have constituted a basis for the District Court's downward departure. Our opinion in United States v.

9

Sweeting, 213 F.3d 95 (3d Cir. 2000), recognizes this basis for downward departure outside the Guidelines, but it also forecloses the possibility of any such departur e on this record. See id. at 102 (stating that family disruption is a normal consequence of incarceration). In Sweeting, we denied a downward departure on the basis of extraordinary family circumstances to a single mother withfive children, one of whom had a psychological impairment. See id. at 96–98. The evidence of extraordinary family cir cumstances in this case does not rise to the level that we found inadequate in Sweeting. We will not discuss the issue further, as Mendenhall does not urge this basis upon us and Yeaman specifically argues that family circumstances were not a basis the District Court's decision.

4. Re-Incarceration

A. Validity of Downward Departur e on this Factor

This leaves re-incarceration as the only possible basis for sustaining the District Court's downward departure.4 Sentencing took place on January 22, 1998 and Mendenhall and Yeaman began to serve their sentences within three months of that date. Resentencing took place on April 10, 2000. At that time, Mendenhall had been released from community confinement and had been living with his family (on probation) for a period of roughly 16 months. Yeaman had served ten months in a federal prison camp and a brief term of community confinement and had been free for over a year. The District Court specifically departed downward on the basis that Yeaman and Mendenhall had served their original sentences, and that it would be "cruel" to return the defendants to prison following the completion of their original sentences.5

_____

4. The defendants claim the government has waived any objection to reincarceration as a basis for downwar d departure, because the government, in several instances, acknowledged that the circumstances of this case were unique or unusual. We have found multiple instances in the record where the gover nment made clear that it is opposed any downward departure in this situation. The government does not, however, contest the theoretical possibility of a downward departures based on reincarceration in some other factual situation.

5. Again we observe that Mendenhall was never incarcerated, but served 10 months in community confinement.

10

Yeaman's counsel argues that we "should affirm Mr. Yeaman's sentence on [re-incar ceration] alone, and need not address the other bases for departur e." Appellee's Br. at 31.

A court may depart from the guidelines sentence if "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence differ ent from that described." U.S.S.G. S 5K2.0 (1997). Departures should be "highly infrequent," Koon, 518 U.S. at 96; see also Serafini, at *57 (Rosenn, J., dissenting in part and concurring in part) ("Discretion, like the hole in a doughnut, does not exist except as an area left open by a surr ounding belt of restriction," citing Ronald Dworkin, T aking Rights Seriously 31 (1977)).

The Supreme Court has endorsed a four-step test for determining whether a departure fr om the Guidelines should occur based on unusual circumstances. See Koon, 518 U.S. at 95. First, we determine if the factor relied upon in the case makes it special or unusual, taking it outside the heartland. Second, we determine whether departures on such factors have been forbidden by the Commission. Third, we determine whether the Commission has encouraged departures based on such factors. Fourth, we determine whether the Commission has discouraged departures based on such factors. Id.

We conclude that the claims of Yeaman and Mendenhall stumble on the first step of Koon. The defendants here present no unusual circumstances that move their situation outside the heartland. The Sentencing Guidelines promote two central Congressional objectives. First, they promote a vertical sentencing uniformity by identifying an appropriate sentencing range for any given crime in light of the goals of sentencing. Second, they promote a horizontal uniformity in sentencing by requiring that similarly situated defendants are sentenced similarly. See U.S.S.G. Ch. 1. Pt. A. P 3 (policy statement). Under the Guidelines scheme, the calculated sentence is presumed to be the standard sentence for typical cases within the"heartland." As the lower end of the sentencing range cannot be bridged

11

without some basis for downward departur e, we can conclude that it must identify the minimum sentence required in the heartland case to satisfy the goals of general deterrence, specific deterrence, r etribution, and rehabilitation. See 18 U.S.C. S 3553(a) (setting forth the goals of sentencing).

In a system administered by human beings, err ors are inevitable.6 Errors under the Sentencing Guidelines result in breaches of the intended uniformity, however, and error correction is essential to attaining the twin goals of the Guideline scheme. Accordingly, the Guidelines contemplate the correction of errors through appellate review. See U.S.S.G. Ch. 1 Pt. A. P 2; 18 U.S.C. S 3742(b)(2). The correction of errors in sentencing necessarily involves reincarceration in that class of cases where the sentence imposed was less than it should have been and as a r esult, the defendant has been released prior to the correction of the error.

The District Court here held that reincar ceration in and of itself constitutes an aggravating or mitigating factor not adequately taken into account by the Guidelines scheme. We can not agree. Rather, r eincarceration as a means to correct error is inherent in the pr ocess of Guideline sentencing. Indeed, as we have indicated, the corr ection of error through reincarceration pr ovides the only means of preserving the appropriateness and unifor mity of sentencing.

Accepting the District Court's view that err or correction through reincarceration places a case outside the heartland would require us to endorse the pr oposition that the original imposition of unduly lenient sentences can entitle defendants in Yeaman's and Mendenhall's positions to sentences that do not conform to the intended uniform pattern. Such an endorsement would not only be inequitable and inconsistent with Congressional intent, it would also produce the greatest deviation from the desired uniformity in those cases where the original errors are the most egregious. Permitting a downwar d departure to avoid

_____

6. See Alexander Pope, An Essay on Criticism, part ii, line 325 (1711) ("To
err is human . . .．").

12

reincarceration where an erroneously lenient sentence is successfully appealed would have the perverse ef fect of compounding judicial error. The mor e egregious the error of a District Court at an original sentencing, the mor e likely that error would become irreversible. If, for example, the District Court in this case had misinterpreted the proper guidelines sentence as requiring only four years imprisonment for each defendant, no departur e would have been available under the District Court's theory. Only when the error is most egregious does this theory support departure. We are especially hesitant to adopt a rule that creates such dubious inversions.7

We hold only that error correction through reincarceration cannot alone take a case outside the heartland. We do not rule out the possibility that

_____

7. In support of its view, the District Court made reference to this Court's opinion in United States v. Romualdi, 101 F.3d 971 (3d Cir. 1996). In that case, we reversed an err oneous sentence of home confinement that should have been a sentence of three years incarceration. In the course of our opinion, we suggested that on remand the District Court might consider whether a departur e would be appropriate:

> [W]e note that Romualdi has apparently completed his service of the most stringent part of the sentence imposed by the district court, i.e. home confinement for six months. On r emand, the district

court

> may want to consider whether this is a factor that would warrant departure.

Id. at 977.

We read this language as suggesting that in the absence of any compensation under the guidelines for time err oneously served in home confinement, such confinement might possibly be credited to the defendant through a downward departur e mechanism at resentencing. See 18 U.S.C. S 3585 (b) (providing that a defendant shall be given credit toward the service of a term for any time spent previously in federal custody); Edwards v. United States, 41 F.3d 154 (3d Cir. 1994) (holding that home confinement is not official detention for purposes of 18 U.S.C. S 3585(b)).

Romauldi thus has no bearing on cases like the ones before us where the defendants will receive full credit for the time they have served and the sole issue is whether reincarceration for error correction can alone move the defendant's case outside the heartland.

13

extraordinary circumstances surrounding reincarceration or extraordinary effects of reincarceration in a particular case may provide a basis for departure just as the circumstances and effects of an original incarceration, if sufficiently extraordinary, can constitute a basis for a downward departure. See United States v. Milikowsky, 65 F.3d 4,7 (2d Cir. 1995) (downward departure to avoid incarceration warranted under "extraordinary family circumstances" exception); United States v. Lara, 905 F.2d 599, 605 (2d Cir. 1990) (downward departure for "extreme vulnerability" during incarceration). Yeaman and Mendenhall, however, present no extraordinary circumstances or effects of reincarceration moving their cases beyond the heartland.

Under the Guidelines a sentence for Yeaman of at least eight years and one month and a sentence for Mendenhall of at least five years and three months are deemed necessary to serve the Congressionally declared objectives of sentencing and the goal of uniform treatment of similarly situated defendants. Any departure from those minima must be justified by extraordinary circumstances placing their cases beyond the heartland and must be consistent with the objectives of the Guidelines. U.S. v. Gomez–Villa, 59 F.3d 1199 (11th Cir. 1995); U.S. v. Ullyses–Salazar, 28 F.3d 932 (9th Cir. 1994). We are unwilling to hold that the original imposition of unduly lenient sentences and the resulting necessity of reincarceration of the defendants following correction of those sentences can justify the fourteen month and ten month sentences here under review.

III.

We will reverse the judgment of the District Court and remand for resentencing in a manner consistent with this opinion.

14

NYGAARD, J., dissenting in part:

I agree with my colleagues that the District Court erred by relying upon the sentencing disparities between appellants and their co-defendants as a basis for downward departure. Further, I reluctantly agree that re-incarceration, even where, as here, it is wholly unnecessary and antithetical to the historical purposes of criminal law and penology, in and of itself does not take this case out of the heartland. However, in contrast to the Majority, I do not think the District Court abused its discretion by departing downward on the basis of extraordinary r ehabilitation. Accordingly, I would affirm the District Court on this issue, but remand the cause for it to determine if the departure is reasonable on this basis alone.

With respect to Mendenhall, the Majority contends that his three proffered examples of rehabilitation are not significant. Maj. Op. at 6. It finds nothing extraordinary about his conduct on parole, his career change, or his participation in counseling. I disagree with the Majority's characterization of Mendenhall's efforts and agree with the District Court that, when considered together , they amount to remarkable change. First, Mendenhall's work with probation was far above average. His supervising parole officer reported that during his supervised r elease, Mendenhall "performed admirably.""Admirable" is not synonymous with "average" or even "well." It connotes something distinct and exceptional. The Majority overlooks this highly complimentary statement altogether in assessing the merits of Mendenhall's conduct while on parole.

Mendenhall's parole officer also stated that"based on Mr. Mendenhall's performance while on supervision, I would venture to opine that his criminal conduct is likely aberrant and is not likely to be repeated." The Majority fails to attach much, if any significance to this statement. W ithout explaining why, it quickly finds that "this statement hardly amounts to evidence of extraordinary rehabilitation." Again, I disagree.

Given the dismal statistics regarding r ecidivism, the Parole Officer's observation and opinion indicates

15

something truly unique and remarkable. It demonstrates that Mendenhall did not just comply with the r equirements of his parole and avoid violations. Mor e importantly, he displayed a sincere, genuine desire to change his life. This conduct and earnestness, although the highest goal of corrections, is unfortunately rare among convicted offenders. Mendenhall left a marked impr ession on the parole officer. I accept the District Court's finding that Mendenhall's behavior was exceptional.

Next, I believe Mendenhall's pursuit of architecture reflects a "real, positive change in behavior." A letter from his current employer states that Mendenhall"accepts responsibility and deadlines, has shown integrity, and has a true desire to increase his professional skills and become a fully licensed architect. His talent, moral ethic, and people skills would make Nolan hard to r eplace." Mendenhall did not begrudgingly change careers. Rather, he approached his new job with a positive attitude and worked hard to achieve success. This was not r equired by the criminal justice delivery system. Mendenhall's success, not only his work-product but also his workplace relationships, reflects an inner desir e and a commitment to move forward with his life and to do so in a moral, lawful manner. His attitude indicates extraor dinary rehabilitative efforts.

Finally, Mendenhall's participation in therapy exemplifies the exceptional nature of his rehabilitation. For example, Mendenhall initiated therapy sessions on his own, without any prompting from the court. He did this because he wanted to "improve his marriage, his ability to be a better father, and to learn from his mistakes that he had made in the past." Additionally, Mendenhall began therapy before he knew that he faced resentencing, thus demonstrating his sincerity. As his therapist stated, "[w]orking with forensic populations on a frequent basis, I was impr essed that he voluntarily came forth, willing to examine his past patterns of behavior at a time in which there did not seem to be a compelling need to impress a judge or other sentencing authority." Moreover, Mendenhall did not merely show up for therapy. He was an active participant, willing to work through difficult issues and examine his conduct. In

16

essence, he recognized that he needed help, and took responsibility for his actions. His therapist described him as "genuinely motivated to become a more moral and effective person and to forever avoid situations that have historically proven to be high risk" and as someone who "is concerned about morals and the implications of his conduct."

Despite these accolades, the Majority summarily concludes that there is no evidence to suggest that counseling was "somehow present to an extraordinary degree in this case." In my view, this minimizes Mendenhall's participation and achievements in therapy and fails to appreciate the important distinction between openly engaging in therapy and merely showing up with old attitudes intact. Many offenders do the latter in order to meet a requirement; they "fake it to make it" without any intention of looking inward and questioning their behavior. Mendenhall did just the opposite. If his efforts were not outside of, or beyond, the ordinary then I am not certain what is. Accordingly, I conclude that Mendenhall's voluntary participation in therapy, coupled with his "admirable" conduct on parole and in his new job, amount to extraordinary rehabilitation.

Similar to Mendenhall, I also think that Yeaman has made "concrete gains toward tur ning his life around." The Majority acknowledges that Yeaman's conduct was commendable but nonetheless rejects a finding of extraordinary rehabilitation. In my view, the Majority overlooks the unique nature of Yeaman's accomplishments and sets the threshold for extraordinary r ehabilitation too high. First, Yeaman went "above and beyond" what was required of him in prison. Aside fr om being a "model prisoner" with no discipline record, Y eaman became actively involved in the prison community and focused his energies upon helping others. For example, he joined the prison choir and completed Spanish, public speaking courses, and other college courses. Moreover, he tutored inmates who spoke only Spanish. Additionally, Yeaman consistently received outstanding performance r eviews for his work as a janitor. His reviews also reveal that Yeaman had a positive attitude while incarcerated.

17

Yeaman's letters to family and friends r eflect his desire to help others while incarcerated. For example, in one letter, he explained:

> It has been exactly one month since I . . . pr esented myself for incarceration. It seems bizarr e to me that I'm a `prisoner.' Rather, I've adopted the philosophy that I'm a `volunteer.' I can leave really anytime I want to, yet I'm an inmate. Since I'm a volunteer, I then believe that I should do the best at whatever I'm supposed to be volunteering to do. Most of the inmates spend a lot of time hiding from the prison guards and doing the least amount of work possible. I believe that r egardless of the terms of my employment, I should do the best that I can.

J.A. at 365. In another letter, he stated:

> As it turns out this is a period of reflection; of redirecting one's life and contemplating one's future. From that standpoint, this experience has been good for me. And, to the extent that I am able to help others do the same, it is also good. So, the time is passing very quickly now and I am very involved in meeting people and participating in activities.

J.A. at 367.

Helping others in the prison setting is certainly not mandatory. Indeed, active, positive involvement in the prison community is rare. In United States v. Bradstreet, 207 F.3d 76 (1st Cir. 2000), the Court of Appeals for the First Circuit recognized how uncommon it is for prison inmates to focus their efforts on educating others. In that case, the Court affirmed a downward departure for extraordinary rehabilitation because, compared with other inmates whose efforts were focused on self-improvement, the defendant's efforts were substantially concerned with others as well. See Bradstreet, 207 F .3d at 83. We have never held that assisting and educating others may serve as a basis for extraordinary rehabilitation. I would. I think such conduct falls within the general definition of extraordinary rehabilitation that we set forth in United States v. Sally, 116 F.3d 76 (3d Cir . 1997). That is, it reflects a "truly repentant defendant[ ]" who has a

18

"demonstrated commitment to repair and to r ebuild [his]
li[fe]." Sally, 116 F.3d at 80. Accordingly, I believe that
Yeaman's "volunteer" approach, i.e., his efforts to help
Spanish-speaking inmates learn English and his positive
presence and involvement in the prison community,
demonstrate remarkable strides toward changing his life.

Next, Yeaman's shift in attitude during his prison stay
also supports a finding of extraordinary r ehabilitation. In
letters to family and friends, Yeaman r ecognized his own
shortcomings and accepted responsibility for his actions.
Further, he expressed a desire to change his life. He stated:

> Shortly after I got here, I was told by most of the
> inmates various ways to get through the system with
> minimal work and not antagonizing the Prison staf f. I
> questioned myself about how I was going to feel about
> myself under such circumstances and decided that if
> nothing else, I wanted to come out of here with more
> integrity that I came in with. I wasn't going to let the
> system create a scenario where I compr omised my
> values to become like someone's expectations of me.

J.A. at 366.

Yeaman also began cooperating with the United States
Government for the first time. In the past, Yeaman "butted
heads with the United States Government, and .. . tested
the regulators in Washington and thr oughout the country
continually." J.A. at 171. However, after his conviction, he
accepted the government's authority. Along with his
conduct in prison, I think Yeaman's change in attitude also
supports a finding of rehabilitation.

The Majority believes that Yeaman's attitude and
behavior did not significantly improve. It r easons that
Yeaman is a man of strong religious convictions and thus
his attitudes and behaviors during his incar ceration and
supervised release could be reasonably expected. I disagree.1
_____

1. The Majority's reasoning suggests that, as a defendant's level of
insight, capability, and skill prior to conviction increase, his chances
of
achieving post-conviction "extraordinary r ehabilitation" decrease,
because rehabilitative efforts ar e "expected" from such a defendant.

19

Although Yeaman professed strong r eligious beliefs before his conviction and incarceration, he did not apply them in his own life. He committed a serious crime involving fraud and deceit. However, while in prison and after his release, Yeaman demonstrated a genuine commitment to moral principles and values. He is living his life dif ferently than he did before his incarceration. He has not violated the terms of his supervised release and is now successfully managing a cattle ranch. This sort of notable change should not be underestimated. In this case, it indicates an extraordinary effort at rehabilitation.

Finally, it should be noted that a sentencing court has broad discretion in determining whether to grant a downward departure, because it alone has the full flavor of the trial or plea, and all prior proceedings. Thus, it can gauge the full effect of its sentences upon of fender and victim alike. As the Supreme Court stated:"A district court's decision to depart from the Guidelines . . . will in most cases be due to substantial deference, for it embodies the traditional exercise of discretion by a sentencing court." Koon v. United States, 518 U.S. 81, 98, 116 S.Ct. 2035, 2046 (1996). Applying this deferential standar d to the present case, I think the circumstances r elied upon by the District Court are well within the "outside permissible limits" of extraordinary rehabilitation and are commensurate with circumstances "found exceptional in existing case law." United v. Serafini, 233 F.3d 758, 772 (3d

_____

Thus, under the Majority's rationale, less tr oubled defendants need to do more to reach the goal of extraor dinary rehabilitation than defendants with few to no skills and highly negative attitudes and behaviors. In my view, this approach unfairly punishes the for mer. A defendant's positive behaviors and strengths prior to conviction do not negate his postconviction "commitment to repair and r ebuild" his life or render his postconviction behavorial changes less real or significant. Our "definition" of extraordinary rehabilitation simply requires a "truly repentant defendant" who has made "concr ete gains toward turning his life around." Sally, 116 F.3d at 81. Yeaman and Mendenhall have demonstrated the requisite gains for extraor dinary rehabilitation. Indeed, the record shows that it is highly unlikely that they will commit another crime. This type of rehabilitation is extraor dinary for any criminal to achieve, regardless of his previous background.

20

Cir. 2000). As noted above, both Yeaman and Mendenhall distinguished themselves from other inmates and took concrete steps toward changing their lives. Therefore, I do not think the District Court abused its discr etion by departing downward for extraordinary r ehabilitation.

The Majority had no need to address the extent of the District Court's departures because it r ejected extraordinary rehabilitation altogether . Because I think a departure is permissible, I will briefly discuss my views on the penological reasonableness of the court's departure.

We have long been guided by the standar d of 18 U.S.C.A. S 3742(e)(3), which directs a District Court to impose a sentence "sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Paragraph (2), in turn, lists four purposes of sentencing, which include the need:

> (A) to reflect the seriousness of the of fense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner .

Id. S 3553(a)(2). I believe we should return to the purposes of sentencing, and attempt to make sense of what we are trying to accomplish whenever we are called upon to review a sentence, or as here, determine whether the extent of a court's sentencing departure was reasonable.

The first purpose of sentencing is to reflect the seriousness of the offense, promote r espect for the law, and to provide just punishment. In this case, we have empirical evidence that this purpose has been met. The sentence and time already served have brought about a r emarkable rehabilitation in these two individuals, who ar e now leading exemplary lives. The evidence of record indicates that they have indeed developed a respect for the law. Both Yeaman

21

and Mendenhall exhibited model behavior while confined, took steps to change their careers, accepted r esponsibility for their illicit conduct, and sincerely apologized. If all offenders left confinement as these two have, we could fold our tents. A criminal justice delivery system could not hope for better results.

The second purpose of sentencing is to affor d adequate deterrence to criminal conduct. Yeaman and Mendenhall have already served time. They have been punished. Sending them back to prison for a longer ter m would not enhance the deterrent effect of their original sentences. It is widely recognized that the duration of incarceration provides little or no general deterrence for white collar crimes. See A. Mitchell Polinsky & Steven Shavell, On the Disutility and Discounting of Imprisonment and the Theory of Deterrence, 28 J. LEGAL S TUD. 1, 12 (Jan. 1999). For individuals committing these types of crimes, the probability of being apprehended and incar cerated is a powerful deterrent in of itself, because the "disutility of being in prison at all and the stigma and loss of earning power may depend relatively little on the length of imprisonment." Id. at 12 (suggesting that "less than-maximal sanctions, combined with relatively high probabilities of apprehension" is "optimal" for white collar crimes). Thus, there is not a scintilla of evidence here that longer sentences will deter anyone from committing mail and wire fraud.2 It is mer e speculation. Hence, I cannot say the District Court abused its discretion by finding that this condition was met.

The third purpose of sentencing is to pr otect the public from further crimes by the defendant. In this case, there is absolutely no evidence that either Yeaman or Mendenhall would commit further crimes. Indeed, here we have expert opinion to the contrary, stating that this behavior is "not

_____

2. I cannot help noting in the margin that upon Robert Downey Jr.'s re-arrest following a year's sentence in prison, he said "[t]he threat of prison
has been eliminated for me. I know I can do time now." Claudia Puig & Kelly Carter, Are Awards Good for Downey? Hollywood's Attention May Not Help Actor Kick Drug Habit, U.S.A. T oday, March 15, 2001, at D1. So much for punishment and prison as a deterrent!

likely to be repeated." And as explained above, Yeaman's and Mendenhall's rehabilitative efforts were extraordinary: They did more than "they were supposed to do" and made "concrete gains toward `turning [their lives] around.' " Sally, 116 F.3d at 81. Based upon their recor ds and the evidence in this case, the most likely conclusion is that Y eaman and Mendenhall will never commit fraud or any other crime again.

The fourth goal of sentencing is to provide needed educational or vocational training, medical car e, or other correctional treatment in the most ef fective manner. No one even argues that Yeaman or Mendenhall need such services.

I believe that a departure serves the historical, penological, and statutory purposes of sentencing, even as set forth in the Guidelines. Yet, under the Majority's mandate, Yeaman and Mendenhall will be r eturned to prison, perhaps for as many as four years-- at a cost to the U.S. taxpayer of roughly a quarter of a million dollars. To me this case illustrates the sheer folly and utter nonsense of offense-based theory, and the need to use corrections-based sentencing. There is not a shred of evidence that either Yeaman or Mendenhall need re-incarceration. No penologist could hope for better results from the criminal justice delivery system than these repentant, rehabilitated, and now fully functioning and productive individuals.

In closing, I find the quote from Pope's An Essay on Criticism, a bit ironic. See Maj. Op. fn. 6. The full strain of Pope's quote, however, is instructive. It r eads:

> Good nature and good sense must ever join,
> To err is human, to forgive, divine.

Because it is human to err, we must employ our good sense and nature, and rise to forgiveness. I cannot see that we have. If ever there is a place where good nature and good sense are not conjoined, it is in the U.S. Sentencing Guideline scheme-- a mechanical construct that is devoid of feeling. Forgiveness could not possibly have been a flicker in its framers' eyes. One of the primary goals of sentencing outlined in Section 3742(e)(3) is to"provide just

23

punishment for the offense." But, law divor ced from common sense is seldom just. In my view, this case is no exception.

Hence, I respectfully submit this concurr ence and dissent.

A True Copy:
Teste:

    Clerk of the United States Court of Appeals
    for the Third Circuit